ACUITY, a Mutual Insurance Company,
Plaintiff-Appellant-Petitioner,

v.

Kishan BAGADIA, UNIK Associates, LLC,
Symantec Corporation and
Quarterdeck Corporation,
Defendants-Respondents.

Supreme Court

*Nos. 2006AP1153, 2006AP1974.*
*Oral argument February 20, 2008.*
*—Decided June 18, 2008.*

2008 WI 62

(Also reported in 750 N.W.2d 817.)

For the plaintiff-appellant-petitioner there were briefs by *Arthur P. Simpson, Michelle D. Johnson,* and *Simpson & Deardorff, S.C.,* Milwaukee, and oral argument by *Arthur P. Simpson.*

For the defendants-respondents, Symantec Corporation and Quarterdeck Corporation, there was a brief by *John S. Skilton, Michelle M. Umberger, Eric G. Barber,* and *Heller Ehrman LLP,* Madison, and *Christopher F. Stoll* and *Heller Ehrman LLP,* San Francisco, Calif., and oral argument by *John S. Skilton.*

For the defendants-respondents, Kishan Bagadia and UNIK Associates, LLC, a letter was filed by *Steven P. Bogart* and *Reinhart Boerner Van Deuren* S.C., Milwaukee.

An amicus curiae brief was filed by *Beth Ermatinger Hanan* and *Gass Weber Mullins LLC,* Milwaukee, on behalf of Wisconsin Insurance Alliance.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. A lawsuit in the United States District Court for the District of Oregon (hereinafter "District Court of Oregon") that resulted in a judgment for $958,253.40 entered against two of the respondents, Kishan Bagadia and UNIK Associates (collectively, "UNIK"), and in favor of the two other respondents, Symantec Corpora-

201

tion and Quarterdeck Corporation (collectively, "Symantec"), precipitated the present action filed by UNIK's insurer, Acuity Mutual Insurance Company ("Acuity"), in the Waukesha County Circuit Court.[1] Acuity sought a declaration that its insurance policy with UNIK does not cover the damages entered by the District Court of Oregon for an "advertising injury" Symantec alleges that it incurred as a result of UNIK's infringement of Symantec's copyrights and trademarks. Alternatively, in the event the circuit court ultimately held that Acuity's policy does cover the damages, Acuity sought a declaration that the amount it owes UNIK is set off by the amount Symantec has allegedly recovered from another insurer.

¶ 2. The circuit court entered a final judgment against Acuity, directing Acuity to indemnify UNIK for the full $958,253.40, plus interest.

¶ 3. We review the decision by the court of appeals[2] affirming the circuit court's entry of final judgment against Acuity and in favor of UNIK and Symantec. Two issues confront us: (1) Whether, under Acuity's Commercial General Liability ("CGL") insurance policy, UNIK engaged in "advertising activity" resulting in UNIK's infringement of Symantec's copyrights and trademarks, thereby obligating Acuity to indemnify UNIK. (2) If so, whether the amount in which Acuity is obligated to indemnify UNIK may be offset by the amount Symantec purportedly has already received from another insurer. We affirm. We hold that Acuity is liable for the damages entered against UNIK, because Acuity's policy assures coverage for the copy-

---

[1] The Honorable Mark S. Gempeler presided.

[2] *Acuity v. Bagadia,* 2007 WI App 133, 302 Wis. 2d 228, 734 N.W.2d 464.

right and trademark infringement UNIK committed as a result of advertising Symantec's products. However, we decline to consider whether Acuity is entitled to have the judgment amount offset by the amount Symantec has allegedly collected from another insurer because the record with respect to that issue is insufficiently developed for us to render a decision.

## I. BACKGROUND[3]

¶ 4. In 2002, Symantec sought to put a halt to UNIK's unauthorized distribution and sale of Symantec software by filing a lawsuit in the District Court of Oregon alleging copyright and trademark infringement. Symantec creates, publishes and manufactures software that protects the security of personal computers. It owns four copyrights at issue: Norton AntiVirus®, Norton Utilities®, Norton Ghost®, and Norton CleanSweep®. It also owns six trademarks at issue: Symantec®, Norton SystemWorks®, Norton AntiVirus®, Norton Utilities®, Norton Ghost®, and Norton CleanSweep®.[4]

---

[3] The facts set forth are undisputed. The portion of the "Background" section describing the litigation in the District Court of Oregon collects its facts from Symantec's complaint in that lawsuit, from exhibits contained in the record, from the district court's opinion granting summary judgment in Symantec's favor and from the district court's separate opinions awarding costs and fees. The opinion granting summary judgment is apparently unpublished and unavailable, both in the reporters and the electronic databases. The opinions awarding costs and fees are found in: *Symantec Corp. v. CD Micro, Inc.,* No. 02–406–KI, 2005 WL 1334557 (D. Or. Jun. 2, 2005) and *Symantec Corp. v. CD Micro, Inc.,* No. 04–227–KI, 2005 WL 1972563 (D. Or. Aug. 12, 2005) (consolidated cases).

[4] More precisely, Quarterdeck owns the copyright and trademark on Norton CleanSweep®, while Symantec owns the copyrights and trademarks on the other products.

UNIK Associates, which is insured by Acuity, is a Wisconsin-based software vendor whose business focuses primarily on purchasing computer software at discount prices and then selling that software to resellers. Symantec claimed in the federal suit that UNIK, among other actions, advertised, distributed, and sold Symantec's copyrighted and trademarked products without authorization. Symantec also alleged that UNIK's actions caused injury to Symantec, including consumer deception and confusion.

¶ 5. The District Court of Oregon issued summary judgment in Symantec's favor. It found that UNIK "advertised [Symantec's] SystemWorks®[5] software through trade magazines, telephone marketing, direct mailings, and supplying samples to interested buyers." *Symantec Corp. v. CD Micro, Inc.,* No. 02–406–KI, slip op. at 4 (D. Or. Feb. 24, 2005). UNIK placed advertisements bearing Symantec's trademarked name in computer trade magazines. In addition, UNIK shipped samples of Symantec's SystemWorks® products to existing customers who requested them over the phone. UNIK would ship a sample disk containing the SystemWorks® software in a plain, white paper sleeve without a retail box or a manual. In accordance with the customer's specifications, UNIK would mark the inner hub of the sample disk to indicate the SystemWorks® products contained within. The customer would inspect the sample. If the sample met the customer's approval, the customer would place a full order for the product with UNIK. UNIK, in turn, would place the order with its supplier and, upon receipt, would ship the full order

---

[5] The SystemWorks® software constitutes "suites" of six separate software products, including the trademarked Norton SystemWorks®, Norton AntiVirus®, Norton Utilities®, and Norton Ghost®.

to its customer in the plain, white sleeves it used to ship the samples. Symantec sold each of its SystemWorks® suites of software for more than $40, but UNIK sold them at prices ranging from $3.50 to $20. UNIK sold 117,273 copies of Symantec's software between December 2000 and October 2003, generating approximately $845,672 in gross revenue.

¶ 6. The federal court concluded that UNIK's actions violated Symantec's copyrights and trademarks. It ordered both an injunction and monetary damages. The court enjoined UNIK from "[d]isseminating, promoting, selling, offering for sale, distributing, or using any unauthorized copies" of Symantec's copyrighted products. *Symantec,* No. 02–406–KI, [Stipulated] Permanent Injunction, ¶ 1(a) (D. Or. May 3, 2005). It further enjoined UNIK from "[p]rocuring, using (including use on web sites, on the Internet, and on any products distributed by UNIK), reproducing, counterfeiting, or copying any of [Symantec's] registered trademarks, or distributing any products bearing [Symantec's] trademarks." *Id.* at ¶ b.

¶ 7. The court also imposed monetary damages. It awarded statutory damages of $60,000 for each of the six Symantec trademarks UNIK infringed and $15,000 for each of the four Symantec copyrights UNIK infringed. Pursuant to federal statutes[6] providing for election of damages, Symantec elected to recover the $360,000 in statutory trademark infringement damages, but elected to forego the $60,000 in statutory copyright infringement damages in favor of collecting $272,226 in actual copyright infringement damages. The court also awarded Symantec costs and attorney's

---

[6] *See* 15 U.S.C. § 1117(c) for the available election of damages for trademark infringement. *See* 17 U.S.C. § 504(b) for the available election of damages for copyright infringement.

fees of $326,07.40, bringing the total judgment against UNIK to $958,253.40.

¶ 8. Meanwhile, as the federal lawsuit unfolded, Acuity filed a lawsuit in Waukesha County Circuit Court, seeking, via a motion for summary judgment, a declaration that it had no duty to defend UNIK in the Oregon action. The court denied Acuity's motion and ordered Acuity to defend. However, the District Court of Oregon entered final judgment against UNIK. Acuity, Symantec and UNIK then filed cross motions for summary judgment with respect to the question of whether Acuity had a duty to indemnify UNIK for the federal court judgment. The circuit court denied Acuity's motion and granted Symantec's and UNIK's respective motions. In its final judgment, the court ordered Acuity to indemnify UNIK for the full $958,253.40 plus prejudgment interest, despite Acuity's request that the award be offset by the alleged $165,964.38 Symantec had already received from Continental Casualty Company.[7]

¶ 9. The court of appeals affirmed. *Acuity v. Bagadia*, 2007 WI App 133, ¶ 1, 302 Wis. 2d 228, 734 N.W.2d 464. It held that Acuity's insurance policy with UNIK covered Symantec's judgment with respect to both its copyright infringement and trademark infringement

---

[7] Symantec opposed Acuity's request for an offset, contending that Continental Casualty Company's alleged payment was subject to a reservation of rights to contest coverage.

Continental is not a party to this suit. Symantec does not dispute that Continental paid it $165,964.38, as Acuity alleges. However, there is no proof in the record that the amount actually was paid. In addition, there is no indication in the record whether there has been a final determination of Continental's legal obligations with respect to Symantec's award. Finally, presumably a Continental insurance policy covering UNIK exists, but it is also absent from the record.

claims. UNIK engaged in "advertising activity," as described in the policy, which resulted from its infringing Symantec's copyrights and trademarks. Accordingly, the court of appeals held that Acuity is obligated to indemnify UNIK for the full amount entered by the circuit court. The court of appeals also denied Acuity's request to offset the award by the $165,964.38 Acuity alleges Symantec received from Continental, pointing out that the record is insufficient to allow it "to determine who owes what." *Id.*, ¶ 24.

¶ 10. The court of appeals employed a three-step test to reach its conclusion that UNIK's activities resulted in "advertising injury" to Symantec, thereby obligating Acuity to indemnify UNIK. *Id.*, ¶ 6. First, the court concluded that copyright infringement and trademark infringement constituted enumerated offenses under Acuity's policy—copyright by virtue of being expressly enumerated in the policy, and trademark by virtue of being encompassed within "title," which is expressly enumerated in the policy. *Id.*, ¶¶ 7, 17. Second, the court concluded that UNIK advertised Symantec's copyrighted and trademarked products and names. *Id.*, ¶¶ 7, 9, 18. Finally, the court concluded that there existed a causal nexus between UNIK's advertising and its infringement of Symantec's copyrights and trademarks. *Id.*, ¶¶ 13, 19, 22.

¶ 11. We granted review and now affirm.

## II. DISCUSSION

### A. Standard of Review

¶ 12. We are called upon to review an entry of summary judgment that interpreted an insurance policy. We review the interpretation of an insurance

207

policy independently, but benefiting from the discussions of the court of appeals and the circuit court. *Nu Pak, Inc. v. Wine Specialties Int'l, Ltd.*, 2002 WI App 92, ¶ 6, 253 Wis. 2d 825, 643 N.W.2d 848. We also review a decision on summary judgment independently, using the same methodology as the circuit court. *Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.*, 2003 WI 33, ¶ 15, 261 Wis. 2d 4, 660 N.W.2d 666; Wis. Stat. § 802.08(2).

## B. Policy Interpretation

¶ 13. We interpret undefined words and phrases of an insurance policy as they would be understood by a reasonable insured. *Westphal v. Farmers Ins. Exch.*, 2003 WI App 170, ¶ 21, 266 Wis. 2d 569, 669 N.W.2d 166. If the policy language is unambiguous, we interpret the policy in accordance with the plain meaning of its provisions. *See Garriguenc v. Love,* 67 Wis. 2d 130, 135, 226 N.W.2d 414 (1975). If, however, the language that is undefined in the policy is "susceptible to more than one reasonable construction when read in context," it is ambiguous. *Westphal,* 266 Wis. 2d 569, ¶ 21. When such policy language relates to coverage and is ambiguous, we interpret the policy in favor of the insured to afford coverage. *Cardinal v. Leader Nat'l Ins. Co.,* 166 Wis. 2d 375, 382, 480 N.W.2d 1 (1992).

¶ 14. Acuity's CGL policy states that it "will pay" its insured sums it is legally obligated to pay as a result of advertising injury caused by the insured. The policy further states that it provides coverage for "advertising injury" "caused by an offense committed in the course of advertising [the insured's] goods, products or services." The policy defines "advertising injury" as an injury

stemming from, among other things, "[m]isappropriation of advertising ideas or style of doing business" or "[i]nfringement of copyright, title or slogan."

¶ 15. We examine the provisions more closely. The policy provides in pertinent part:

LIABILITY AND MEDICAL
EXPENSES COVERAGES

1. Business Liability

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of ... *advertising injury* to which this insurance applies.

. . . .

b. This insurance applies [to]:

. . . .

(b) *Advertising injury* caused by an offense committed in the course of advertising your goods, products or services;

. . . .

LIABILITY AND MEDICAL EXPENSES DEFINITIONS

1. "*Advertising injury*" means injury arising out of one or more of the following offenses:

. . . .

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title or slogan.

(Emphasis in original.)

¶ 16. To determine whether these provisions obligate Acuity to indemnify UNIK, we must determine whether UNIK engaged in "advertising activity" resulting in an "advertising injury," as defined by Acuity's policy. We employ a three-step test articulated in *Fireman's Fund* to do so: (1) Does UNIK's conduct fit within an offense the policy enumerates? (2) Did UNIK engage in advertising activity? (3) Is there a causal connection between UNIK's advertising activity and the damages? *See Fireman's Fund,* 261 Wis. 2d 4, ¶ 26. Because the circuit court's final judgment against Acuity required the insurer to indemnify UNIK for damages resulting from both its copyright infringement and its trademark infringement, we must pose all three questions with respect to both copyright and trademark.

C. The *Fireman's Fund* Three-Step Test

¶ 17. We first consider whether UNIK's conduct, related to both copyright infringement and trademark infringement, fits within an enumerated offense in Acuity's CGL policy.

1. Enumerated offense

a. copyright infringement

¶ 18. Acuity concedes that copyright infringement is an enumerated offense within the policy. Indeed, the policy is clear on its face that "advertising injury" means "infringement of copyright." UNIK infringed Symantec's copyrights by distributing sample disks containing Symantec's copyrighted System-Works® software without Symantec's authorization.

210

### b. trademark infringement

¶ 19. The District Court of Oregon found that UNIK infringed Symantec's trademarks when it distributed, without authorization, disks containing computer software denoted by Symantec's trademarked names and when it used Symantec's trademarked names in print advertising.

¶ 20. Symantec contends that trademark infringement is enumerated as an advertising injury either under the policy's "infringement of title" provision or under the policy's "misappropriation of advertising ideas or style of doing business" provision. First, it argues that the plain meaning of the word "title" encompasses trademarks and that numerous courts have so held. Second, it contends that trademark infringement constitutes "misappropriation of advertising ideas or style of doing business."

¶ 21. Acuity responds that our case law has already suggested that trademark infringement does not fall within "infringement of title." Acuity submits that this is the correct interpretation of the policy, because had the parties intended to ensure coverage for trademark infringement, they would have expressly included the word "trademark" in the policy.

¶ 22. The insurance policy defines advertising injury in part as "infringement of . . . title." "Title" is not a defined term in the policy; consequently, we give "title" its plain, ordinary meaning. *Cieslewicz v. Mut. Serv. Cas. Ins. Co.*, 84 Wis. 2d 91, 97–98, 267 N.W.2d 595 (1978). To do so, we consult dictionaries and the relevant case law that has addressed the issue of whether a trademark is included within the term, "title." In addition, because the evolution of the standard CGL policy form is useful to our analysis, we observe revisions to that form as well.

211

¶ 23. We first consult the dictionary definition of "title." "Title" has been defined as a "distinguishing name" or "a descriptive or distinctive appellation." *Random House Unabridged Dictionary,* 1989 (2d ed. 1993).[8] Also instructive is that the most recent edition of *Black's Law Dictionary* that contains a definition of "title," outside of the context of the ownership of property, refers the reader to the term "trademark." *Black's Law Dictionary,* 1485 (6th ed. 1990). *Black's Law Dictionary* then defined "trademark" as "a distinctive mark of authenticity, through which the products of particular manufacturers or the vendible commodities of particular merchants may be distinguished from those of others."[9] *Id.* at 1493. We observe that dictionaries use similar words to define "title" and "trademark": a "title" is a "distinctive appellation," while a "trademark" is a "distinctive mark."[10]

---

[8] The sixth edition of *Black's Law Dictionary* defines "title" as "[a] mark, style, or designation; a distinctive appellation." *Black's Law Dictionary,* 1485 (6th ed. 1990). Perhaps recognizing that the term's common meaning is no longer appreciably distinct from its legal meaning, the two more recent editions of *Black's Law Dictionary,* the seventh and eighth editions, do not define "title" outside of its application to the ownership of property.

[9] The most recent edition of *Black's Law Dictionary* provides a slightly different definition of the term "trademark": "A word, phrase, logo, or other graphic symbol used by a manufacturer or seller to distinguish its product or products from those of others. *Black's Law Dictionary,* 1530 (8th ed. 2004).

[10] The Western District of New York has concluded that "infringement of slogan" can also include trademark infringement. *J.A. Brundage Plumbing & Roto-Rooter, Inc. v. Mass. Bay Ins. Co.,* 818 F. Supp. 553, 559 (W.D.N.Y. 1993). The court cited the definition of "slogan" found in a leading treatise:

Section 7.5 Slogans as Marks.

¶ 24. We also consider that the Wisconsin Court of Appeals has concluded that trademark infringement falls under "infringement of title." *W. Wis. Water, Inc. v. Quality Beverages of Wis., Inc.,* 2007 WI App 188, ¶¶ 27–28, 305 Wis. 2d 217, 738 N.W.2d 114. The court concluded that unauthorized use of a water supplier's logos on water delivery trucks, truck driver uniforms, and water bottle labels gave rise to a claim for trademark infringement under the policy's "infringement of title" provision. *Id.,* ¶¶ 4, 25, 27–28. It explained that it is reasonable to interpret the phrase "infringement of title" as broad enough to embrace trademark infringement, in part because "infringement of title" is susceptible to multiple interpretations, and in such event, our courts construe the provision in favor of coverage. *Id.,* ¶ 28.

¶ 25. *Western Wisconsin Water* followed the Seventh Circuit's decision in *Charter Oak Fire Insurance Co. v. Hedeen & Cos., C.V.,* 280 F.3d 730 (7th Cir. 2002). There, the insurer, Charter Oak, sought a declaratory judgment against the insureds that it had no duty to defend them against a claim for trademark infringement. *Id.* at 735. Under its CGL policy, which mirrored

---

Neither in the common law nor [in] the Lanham Act is [there] any reason why a plurality of words cannot function as a mark to identify and distinguish goods or services. A slogan or any other combination of words is capable of trademark significance, if used in such a way as to identify and distinguish the seller's goods or services from those of others.

Under common law unfair competition principles, slogans have long been protected against use by others so as to be likely to confuse purchasers . . . . [A] slogan might also incorporate a separate trademark, such that both the slogan and the mark will be protectable.

*Id.* (quoting McCarthy, *Trademarks and Unfair Competition* (2d ed. 1984)).

'the policy at issue here in all relevant respects, Charter Oak argued that trademark infringement was not a covered offense under the policy because (1) the definition of "advertising injury" did not expressly refer to trademark infringement, and (2) the policy's specific inclusion of "copyright infringement" as an advertising injury demonstrated that trademark infringement could not be covered as an advertising injury. *Id.* at 735–36. The court rejected Charter Oak's arguments. *Id.* at 736. Applying Wisconsin law, the court held that the trademark infringement claim fell within the policy's "infringement of title" provision. *Id.* It reasoned that " 'infringement' means using someone else's words," while " 'title' refers to names and related trademarks." *Id.*

¶ 26. *Western Wisconsin Water* deemed *Charter Oak* its "authoritative guide" for three reasons. First, *Charter Oak* was decided six years after *Advance Watch Co. v. Kemper National Insurance Co.,* 99 F.3d 795 (6th Cir. 1996), a case relied upon by the insurer that reached a conclusion contrary to *Charter Oak*'s more recent conclusion. *W. Wis. Water,* 305 Wis. 2d 217, ¶ 27. Second, *Charter Oak* applied Wisconsin law. *Id.* Finally, *Charter Oak* rejected the holding of two other federal circuit court cases that adopted *Advance Watch*'s holding that "infringement of title" does not include trademark infringement. *Id.*

¶ 27. *Western Wisconsin Water* and *Charter Oak* are in step with numerous courts addressing the issue of whether trademark infringement is included within "infringement of title."[11]

---

[11] *See, e.g., Heritage Mut. Ins. Co. v. Advanced Polymer Tech., Inc.,* 97 F. Supp. 2d 913, 922 (S.D. Ind. 2000); *Sentex Sys., Inc. v. Hartford Accident & Indem. Co.,* 882 F. Supp. 930, 944 (C.D. Cal. 1995).

¶ 28. In addition, of significant historical note, it has been observed that, prior to 1986, the standard Insurance Service Office CGL policy form "included 'unfair competition' as a covered class of advertising injuries, and [expressly] *excluded* injuries resulting from trademark, service mark and the trade name infringement." *Bay Elec. Supply, Inc. v. Travelers Lloyds Ins. Co.*, 61 F. Supp. 2d 611, 617 (S.D. Tex. 1999) (emphasis added). However, in 1986, the Insurance Service Office, which publishes standard forms widely used in the property and casualty insurance industry, revised the form to replace "unfair competition" with the phrase "misappropriation of advertising ideas and style of doing business," while it also *eliminated* the trademark, service mark and trade name exclusion. *Id.* The revision therefore implies that claims related to trademark infringement would be included within the revised CGL policy. *Id.*; *see also, Adolfo House Distrib. Corp. v. Travelers Prop. & Cas. Ins. Co.*, 165 F. Supp. 2d 1332, 1340 n.4 (S.D. Fla. 2001).

¶ 29. Given the plain meaning of "title," the reasoning of *Western Wisconsin Water* and *Charter Oak,* and the evolution of the standard CGL policy form, we conclude that the "infringement of title" provision in Acuity's CGL policy encompasses claims of trademark infringement. Symantec owns trademarks in each of the following: Symantec®, Norton SystemWorks®, Norton AntiVirus®, Norton Utilities®, Norton Ghost®, and Norton CleanSweep®. Each of these designations is either the title of a software program they name or the brand under which those programs are sold (in the case of Symantec®). Accordingly, UNIK engaged in an enumerated offense when it infringed Symantec's trademarks.

¶ 30. Acuity argues, however, that *Fireman's Fund* has already intimated that "infringement of title" does not include infringements of trademark. In *Fireman's Fund,* we concluded that the complaint sufficiently stated a claim for trade dress infringement under a policy that defined "advertising injury" to include "infringement of *trademark,* copyright, title or slogan." *Fireman's Fund,* 261 Wis. 2d 4, ¶¶ 25, 29–34 (emphasis added). Accordingly, unlike the policy at issue here, the policy at issue in *Fireman's Fund* expressly included trademark infringement within the definition of "advertising injury." *Id.*, ¶ 25. We noted that the insurance company had recently added trademark infringement to its policy and thereby "broadened" the definition of advertising injury. *Id.*, ¶ 25 n.23. Acuity contends that *Fireman's Fund* supports the proposition that its policy cannot be construed to include infringement of trademark as an enumerated offense because the policy does not expressly list "trademark" among the advertising injuries.

¶ 31. Acuity's argument misses the mark because the policy at issue in *Fireman's Fund* contained a different provision than the one presented here. We did not address the question of whether an infringement of trademark may come within the term, "title." While footnote 23 of the *Fireman's Fund* opinion refers to the policy's addition of the word "trademark" as a "broaden[ing]" of the definition of "advertising injury," nothing in the opinion suggests that an "infringement of title" provision excludes claims for infringement of trademark.

¶ 32. Acuity further argues that there can exist no trademark infringement claims under its policy because, had the parties intended to ensure coverage for trademark infringement, they would have expressly

included the word "trademark" in the "copyright, title or slogan" provision in the policy. Acuity relies on *Advance Watch* as support.

¶ 33. *Advance Watch* held that a policy provision defining "advertising injury" as "infringement of copyright, title or slogan" does not encompass trademark infringement claims. *Advance Watch,* 99 F.3d at 802–04. The court reasoned that the term "advertising" was limited to verbal conduct and that the word "trademark" did not appear in the policy definition of "advertising injury." *Id.* at 802–03.

¶ 34. *Advance Watch* is unpersuasive. First, we discern no compelling reason to limit the term "advertising" to verbal conduct. Indeed, both the "narrow" and "broad" definitions of advertising commonly recognized in case law encompass non-verbal conduct. The cases recognize that "advertising" is narrowly defined as "widespread announcement or distribution of promotional materials" and broadly defined as "any oral, written, or graphic statement made by the seller in any manner in connection with the solicitation of business." *See, e.g., Fireman's Fund,* 261 Wis. 2d 4, ¶ 43. These alternate definitions, by ascribing a definition to "advertising" that embraces more than verbal conduct, undermine *Advance Watch*'s conclusion.[12]

¶ 35. Second, as we have already discussed, the absence of the word "trademark" in a CGL policy does not foreclose the conclusion that trademark infringement is covered under the "advertising injury" provision

---

[12] Moreover, *Advance Watch Co. v. Kemper National Insurance Co.,* 99 F.3d 795 (6th Cir. 1996), is an "anomaly." *Adolfo House Distrib. Corp. v. Travelers Prop. & Cas. Ins. Co.,* 165 F. Supp. 2d 1332, 1339 (S.D. Fla. 2001). It has been roundly criticized by other courts as out of step with the prevailing view. *See id.*

in Acuity's policy. The Seventh Circuit concluded in *Charter Oak* that trademark infringement is covered under a policy defining "advertising injury" as an "infringement of copyright, title or slogan." *Charter Oak,* 280 F.3d at 736. Numerous courts have held likewise.[13] We agree with these courts that construing the word "title" to encompass trademark infringement claims is consonant both with the canons governing the interpretation of insurance policies and with the plain meaning of "title."

¶ 36. In sum, we conclude that UNIK's infringement of Symantec's trademarks constitutes an enumerated offense under the "advertising injury" provision of Acuity's CGL policy. Symantec's trademark infringement claims fall within the "infringement of title" provision because UNIK infringed on the trademarked titles of Symantec's name and software.

¶ 37. Because we conclude that trademark infringement is encompassed within "infringement of title," we need not consider, as Symantec invites us to do, whether it is also encompassed within the provision of the policy enumerating as an advertising injury "misappropriation of advertising ideas or style of doing business."

2. Advertising activity

¶ 38. We next consider whether UNIK engaged in advertising activity. To do so, we must first address the following question: What is the definition of advertising?

¶ 39. As we have stated above, Wisconsin cases have identified both a broad and a narrow definition of "advertising." However, we have not adopted either

---

[13] *See* note 11, *supra.*

definition. *See Fireman's Fund,* 261 Wis. 2d 4, ¶¶ 42–44. Acuity encourages us to adhere to the general definition of advertising we noted in *Fireman's Fund:* "[g]enerally speaking, advertising refers to calling the public's attention to a product or business by proclaiming its qualities or advantages in order to increase sales or arouse a desire to buy or patronize." *Id.,* ¶ 42 (citing cases quoting *The American Heritage Dictionary of the English Language* (New College ed. 1980) and *Webster's Third New International Dictionary* (4th ed. 1976)). Acuity argues that the court of appeals unnecessarily created new law by adopting what is considered to be the "broad" definition of advertising.

¶ 40. In contrast, Symantec argues that the court of appeals' adoption of the "broad" definition of "advertising" is fully consistent with our rules for interpreting insurance policy provisions. Symantec points out that "advertising" is not defined within Acuity's policy, but it is susceptible to multiple interpretations. Consequently, it asserts that the term is ambiguous. Our cases hold, Symantec contends, that ambiguous policy terms must be construed in favor of coverage.

¶ 41. As we have recounted, our case law recognizes the existence of a broad and a narrow definition of advertising. *Fireman's Fund,* 261 Wis. 2d 4, ¶ 43. We are not limited to those definitions, however. Nor are we limited to the general definition of advertising described in *Fireman's Fund.* Our task is to give the term "advertising" within Acuity's policy its ordinary meaning, because it is a non-technical term not defined in the policy. *Id.* at ¶ 42. We are permitted to consider the definitions of "advertising" in dictionaries of common usage and in legal dictionaries to help us discern its meaning. *See Sch. Dist. of Shorewood v. Wausau Ins. Cos.,* 170 Wis. 2d 347, 367, 488 N.W.2d 82 (1992).

¶ 42. We consider the various definitions of "advertising." Dictionaries of common usage define the term as "calling the public's attention to a product or business by proclaiming its qualities or advantages in order to increase sales or arouse a desire to buy or patronize." *Fireman's Fund,* 261 Wis. 2d 4, ¶ 42 (summarizing cases that quote *The American Heritage Dictionary of the English Language* and *Webster's Third New International Dictionary*). A standard narrow definition and a standard broad definition of "advertising" have evolved in the common law. The standard narrow definition is: "widespread announcement or distribution of promotional materials." *Id.*, ¶ 43. The standard broad definition is: "any oral, written, or graphic statement made by the seller in any manner in connection with the solicitation of business." *Id.* All of these definitions are different in some respects, yet all are reasonable interpretations of the term, "advertising." Accordingly, we conclude that the term is susceptible to multiple reasonable interpretations and is therefore ambiguous. When faced with a policy ambiguity in regard to coverage, we interpret the policy provision liberally in favor of affording coverage to the insured. *Cardinal,* 166 Wis. 2d at 382. Consequently, we will apply the broad definition to the facts before us.

a. copyright infringement

¶ 43. Acuity contends that UNIK did not engage in "advertising activity" with respect to Symantec's copyrights. It emphasizes that the District Court of Oregon focused on UNIK's *sales,* not its advertising, of Symantec software; that the district court did not reference advertising injury; and that only one sentence of the district court's decision mentions advertising at

all. Accordingly, Acuity argues that the district court gave no indication that any advertising activity bore upon its finding of liability for copyright infringement.

¶ 44. Acuity further notes that the disks that UNIK shipped to existing customers were shipped in response to customer requests, and they were packaged in plain, white paper sleeves without retail boxes and without manuals. It argues that such activity cannot be deemed "advertising" under any definition.

■■

¶ 45. We are not persuaded by Acuity's arguments. First, the District Court of Oregon's summary judgment opinion belies Acuity's assertions that the court did not take account of UNIK's advertising activity in finding UNIK liable for copyright infringement. The district court stated that UNIK "*advertised* [Symantec's] SystemWorks® software through trade magazines, telephone marketing, direct mailings, and supplying samples to interested buyers." *Symantec,* No. 02–406–KI, slip op. at 4 (emphasis added). The reference to supplying samples to interested buyers directly implicates UNIK's activity infringing Symantec's copyright through advertising. Accordingly, the district court did not account solely for UNIK's copyright infringement by the sales of copyrighted material, as Acuity contends.

¶ 46. Second, contrary to Acuity's arguments, UNIK's activity in accepting sample orders from existing customers and then sending those customers samples in unmarked sleeves comports with the broad definition of advertising we adhere to in this context. The following facts are undisputed: (1) UNIK sent sample disks to customers; (2) if the customer approved of the sample, the customer placed an order for the disks; (3) within less than three years, UNIK sold over 117,000 disks containing Symantec's copyrights

through this process. We think it is abundantly clear that UNIK's practice of sending sample disks constitutes a "solicitation of business," as we define advertising here.

b. trademark infringement

¶ 47. Acuity argues that our review of whether UNIK engaged in advertising activity that infringed Symantec trademarks is limited to consultation of the District Court of Oregon's summary judgment decision. Acuity contends that the district court's decision makes clear that none of UNIK's activities with respect to Symantec's trademark "proclaim[ed the] qualities or advantages [of the product] in order to increase sales or arouse a desire to buy or patronize," as *Fireman's Fund* described "advertising." *Fireman's Fund,* 261 Wis. 2d 4, ¶ 42. We disagree.

¶ 48. First, in resolving the questions this case presents, we are not required to confine ourselves to the District Court of Oregon's opinion. Our case law and Wisconsin Statutes evince a court analysis of summary judgment wherein we examine "the pleadings, depositions, answers to interrogatories, admissions, and affidavits." *See, e.g., id.*, ¶ 15; Wis. Stat. § 802.08(2). Moreover, in determining whether an insurer has a duty to indemnify, courts routinely consult the entire record. *See, e.g., Great Am. Lloyds Ins. Co. v. Mittlestadt,* 109 S.W.3d 784, 787 n.1 (Tex. Ct. App. 2003); *see also, Med. Liab. Mut. Ins. Co. v. Alan Curtis LLC,* 519 F.3d 466 (8th Cir. Mar. 10, 2008) (reh'ing and reh'ing en banc denied Apr. 18, 2008); *Columbia Mut. Ins. Co. v. Epstein,* 239 S.W.3d 667 (Mo. Ct. App. 2007).

¶ 49. Second, UNIK advertised Symantec's trademark. The district court's finding that UNIK "adver-

222

tised [Symantec's] SystemWorks® software through trade magazines" is undisputed. The magazine advertisements contained in the record show Symantec's trademarked name.[14] UNIK's placing advertisements bearing Symantec's trademark constitutes a "graphic statement made by the seller in any manner in connection with the solicitation of business." *Fireman's Fund,* 261 Wis. 2d 4, ¶ 43.

### 3. Causal connection

¶ 50. The third question is whether there is a causal connection between UNIK's advertising activity and Symantec's harm. *Id.,* ¶¶ 26, 46. In *Fireman's Fund,* we explained that in order to constitute a causal connection between advertising and harm, the advertising need not be the sole cause of harm. Rather, the advertising must merely "contribute materially" to the harm. *Id.,* ¶¶ 52–53.

¶ 51. Acuity argues that the "contribute materially" standard does not apply here. It points out that we identified such a standard in *Fireman's Fund* within the context of deciding whether an insurer had a duty to defend, not a duty to indemnify. *Id.,* ¶ 2. Acuity contends that, because the duty to defend is broader than the duty to indemnify, the "contribute materially" standard is an incorrect standard to apply. Citing case law from other jurisdictions, Acuity asserts that an insurer shoulders the responsibility to indemnify only when the insured's activity and any resulting injury actually falls within the policy's coverage. *See, e.g., United Servs. Auto Ass'n v. Dare,* 830 N.E.2d 670, 675 (Ill. App. Ct. 2005).

---

[14] We have attached the trade magazine advertisements as Appendix A to this opinion.

██

¶ 52. Acuity's argument is perplexing in that it does not refute the proposition that it is sufficient that advertising "contribute materially" to harm in order to establish a causal link between advertising and harm. Although it is true that the duty to defend is broader than the duty to indemnify, that is so because the duty to defend arises from allegations contained in the complaint, whereas the duty to indemnify is supported by fully developed facts. *See, e.g., Fireman's Fund,* 261 Wis. 2d 4, ¶¶ 19–20. Accordingly, an insurer may be obligated to defend claims that it ultimately may not be obligated to indemnify. *See Id.,* ¶¶ 20–21. We agree with Acuity, therefore, that the duty to defend is indeed broader than the duty to indemnify. However, that distinction is not relevant here because it has no bearing on the question of what suffices to establish a causal connection between advertising and injury.

¶ 53. We conclude that the "contribute materially" standard is the proper one to apply. Acuity marshals no authority that compels us to abandon the "contribute materially" standard in this context. In addition, that standard is in accord with Wisconsin law establishing the threshold for assigning liability for damages. *See, e.g., Baumeister v. Automated Prods., Inc.,* 2004 WI 148, ¶ 24, 277 Wis. 2d 21, 690 N.W.2d 1 ("In Wisconsin, the test for causation is whether the conduct at issue was a 'substantial factor' in producing the plaintiff's injury.").

 a. copyright infringement

¶ 54. In applying this standard, we conclude that UNIK's advertising activity contributed materially to its infringement of Symantec's copyrights. The conclusion

that UNIK made sales as a result of disseminating sample disks to customers is inescapable. UNIK's business was to sell software to resellers. To garner sales, UNIK, without authorization, provided potential customers with disks containing Symantec's software products, which enabled the potential customer to try out Symantec's copyrighted software before deciding whether to buy. In less than three years, UNIK sold 117,273 copies of Symantec's $40 software for prices ranging from $3.50 to $20. These sales generated $845,672 in gross revenue.

¶ 55. Our conclusion that UNIK's advertising resulted in copyright injury is further supported by the District Court of Oregon's injunction. The district court enjoined UNIK from "[d]isseminating, promoting, selling, offering for sale, distributing, or using" Symantec's copyrighted products. *Symantec*, No. 02–406–KI, [Stipulated] Permanent Injunction, ¶ 1(a). Federal courts are not permitted to grant an injunction, unless the party seeking it has suffered "irreparable injury." *See, e.g., eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Accordingly, we conclude that based on the record before us UNIK's advertising activity contributed materially to infringing Symantec's copyright, thereby causing Symantec damage.

b. trademark infringement

¶ 56. In its complaint filed with the District Court of Oregon, Symantec alleged that UNIK's advertising activity infringing on Symantec's trademarks likely caused consumer confusion. Advertising activity can contribute materially to the trademark infringement if the advertising activity likely creates consumer confusion. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209 (2000).

¶ 57. The District Court of Oregon noted that customer confusion is a central element of trademark infringement and that UNIK did not contest that it used Symantec's trademarks in a manner that was likely to cause consumer confusion. *Symantec*, No. 02–406–KI, slip op. at 14. It concluded that UNIK violated Symantec's trademarks. *Id.* at 15.

¶ 58. Advertising likely materially contributed to consumer confusion. As we have noted, the advertising resulted in the purchase of disks containing software bearing Symantec's trademarked titles. Additionally, as we have already discussed above with respect to the copyright infringement, the District Court of Oregon's entry of an injunction against UNIK's "reproducing, counterfeiting, or copying . . . or distributing" Symantec's registered trademarks further evinces that UNIK's advertising contributed materially to Symantec's harm. *Symantec*, No. 02–406–KI, [Stipulated] Permanent Injunction, ¶ 1(b).

¶ 59. In sum, we answer all three *Fireman's Fund* questions in the affirmative. First, copyright infringement and trademark infringement are enumerated offenses within Acuity's policy. Second, UNIK engaged in advertising activity with respect to both Symantec's copyrights and trademarks. Finally, UNIK's advertising activity contributed materially to copyright infringement and trademark infringement. Accordingly, we conclude that Acuity is obligated to indemnify UNIK for the amount of damages the circuit court entered in its final judgment, $958,253.40 plus interest.

¶ 60. We do not reach Acuity's argument that the judgment amount should be offset by the amount Symantec purportedly received from Continental Casualty Company. The issue is insufficiently developed. Conti-

nental is not a party to this suit. Although Symantec does not dispute that Continental paid it $165,964.38, as Acuity alleges, there is no proof in the record that the amount actually was paid. In addition, there is no indication in the record whether there has been a final determination of Continental's legal obligations with respect to Symantec's award. Finally, presumably a Continental insurance policy covering UNIK exists, but it is also absent from the record.

## III. CONCLUSION

¶ 61. Two issues are presented in this review: (1) Whether, under Acuity's CGL insurance policy, UNIK engaged in "advertising activity" resulting in UNIK's infringement of Symantec's copyrights and trademarks, thereby obligating Acuity to indemnify UNIK. (2) If so, whether the amount in which Acuity is obligated to indemnify UNIK may be offset by the amount of payment Symantec purportedly has already received. We affirm the court of appeals. We hold that Acuity is liable for the damages entered against UNIK, because Acuity's policy assures coverage for the copyright and trademark infringement UNIK committed as a result of advertising Symantec's products. However, we decline to consider whether Acuity is entitled to have the judgment amount offset by the amount Symantec has allegedly collected from another insurer because the record with respect to that issue is insufficiently developed for us to render a decision.

*By the Court.*—The decision of the court of appeals is affirmed.

PURPLUS-0046

## Network News
### WEEKLY NEWS OF THE COMPUTER INDUSTRY

### NEW TRAINING OPPORTUNITIES ANNOUNCED BY PARTS NOW!

Madison, Wis., August 6, 2003 -- PARTS NOW!, an international distributor of computer printer parts, has announced new training opportunities in October. These full day classes, which teach printer service technicians all aspects of laser printer repair for several models of HP LaserJet printers, will be held at the PARTS NOW! training facility in Madison, Wis.

Among the aspects these comprehensive classes cover are printer features, laser theory, paper path, menus & specialty modes, and teardown and reassembly. All classes conclude with an end-of-class exam.

Printers covered in these classes include the HP LaserJet 2100 series, 4100 series, and 8000 series. PARTS NOW! professional trainers will also lead a color printer class covering the HP Color LaserJet 4500 series.

For more information including class descriptions, directions, and signup information, call (800) 886-6688 to speak with a PARTS NOW! account representative or visit PARTS NOW! on the web at www.partsnow.com.

PARTS NOW! LLC is a distributor of new and refurbished computer printer parts, whole unit printers, and component level repairs. The international wholesaler is the world's largest printer parts reseller for Hewlett-Packard, Lexmark and Canon U.S.A. Inc., and also provides parts for Oki and many other printers.

### WE BUY/SELL
### SOFTWARE
### MEDIA / INK / TONER CARTRIDGES
*Large Volume/Close Outs/Liquidations*
*Lots/Even Whole Warehouse*

**Microsoft, Adobe, Symantec, Corel, ect.**
**As well as Children's and Educational**

Do you have any **Software/Media/Cartridge** for sale?
FAX or EMAIL YOUR LIST TODAY!

**UNIK Associates**
12020 W. Feerick St., Unit D, Milwaukee, WI 53222
Phone: (414) 462-3201 • Fax: (414) 462-3205
email: unikuma@aol.com Web: www.unik.com

UA 000547

229