FROEDTERT MEMORIAL LUTHERAN HOSPITAL, INC.,
Plaintiff-Respondent,

v.

NATIONAL STATES INSURANCE COMPANY,
Defendant-Appellant-Petitioner,

The LOREN LEDGER TRUST,
Defendant-Respondent.

Supreme Court

*No. 2007AP934. Oral argument November 5, 2008.
—Decided May 13, 2009.*

2009 WI 33

(Also reported in 765 N.W.2d 251.)

For the defendant-appellant-petitioner there were briefs by *Norman D. Farnam, John J. Laubmeier,* and *Stroud, Willink & Howard, LLC,* Madison, and oral argument by *Norman D. Farnam.*

For the plaintiff-respondent there was a brief by *Susan E. Lovern* and *von Briesen & Roper, S.C.,* Milwaukee, and oral argument by *Susan E. Lovern.*

¶ 1. DAVID T. PROSSER, J. This is a review of a published decision of the court of appeals, *Froedtert Memorial Lutheran Hospital v. National States Insurance Co.,* 2008 WI App 58, 310 Wis. 2d 476, 750 N.W.2d 926. The decision affirmed an order of the Milwaukee County Circuit Court, Patricia D. McMahon, Judge, granting Froedtert Memorial Lutheran Hospital's (Froedtert) motion for summary judgment against National States Insurance Company (National States). The order awarded Froedtert a cash judgment for

$130,725.63, plus costs, and an additional $63,223.58 for statutory interest under Wis. Stat. § 628.46 (2007–08).[1]

¶ 2. This case requires us to interpret a National States' Medicare Supplemental Insurance (or Medigap) policy issued to Kathleen Ledger (Kathleen) in 1998. The policy provided in part: "Benefits After Medicare Stops—If maximum benefits have been paid under Medicare for in-patient hospital expense, including the lifetime reserve days, we will pay all further expense incurred for hospital confinement that would have been covered by Medicare Part A."

¶ 3. The principal issue presented is whether this policy language requires National States to pay Kathleen's inpatient hospital expense, incurred after exhausting her Medicare Part A benefits, according to Froedtert's standard rate *or* at the lower Medicare reimbursement rate. We are also asked to decide whether the circuit court's award of $63,223.58 in statutory interest under Wis. Stat. § 628.46 was appropriate under the circumstances.

¶ 4. We conclude that the "Benefits After Medicare Stops" provision in National States' 1998 Medigap policy is ambiguous and must be construed against the insurer to provide coverage at Froedtert's standard rate for Kathleen's hospital confinement at Froedtert after her Medicare Part A benefits were exhausted. This construction is supported by the sharp contrast between the uncertain limitations in the provision at issue and the clear limitations contained in other provisions of the policy. It is also supported by the expectations of a reasonable insured that this policy would

---

[1] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

pay for "all further expenses incurred" for hospital confinement. We do not agree, however, that National States is subject to interest under Wis. Stat. § 628.46. The issue of the policy's coverage above the Medicare reimbursement rate was fairly debatable in light of all the facts and circumstances of this case.

¶ 5. Consequently, we affirm in part and reverse in part the decision of the court of appeals, and we remand for further proceedings consistent with this opinion.

## I. BACKGROUND AND PROCEDURAL HISTORY

A. Medicare and Medigap Coverage

¶ 6. An elementary understanding of Medicare is necessary to comprehend this case. In 1965 Congress amended the Social Security Act to create the contemporary Medicare system. *See* Health Insurance for the Aged Act, Pub. L. No. 89–97, 79 Stat. 286 (1965). Medicare is a federally funded health insurance program that provides medical benefits to qualified elderly and disabled Americans. *See* 42 U.S.C. § 1395a, *et seq.* (2006).[2] Medicare is administered by the U.S. Department of Health and Human Services' Center for Medicare and Medicaid Services (CMS).[3]

¶ 7. As part of its administrative duties, the CMS enters into contracts with medical services providers, like hospitals, to provide patient care for Medicare beneficiaries. *See* 42 U.S.C. § 1395cc. The contracts

---

[2] All subsequent references to the United States Code are to the 2006 version unless otherwise indicated.

[3] The Center for Medicare and Medicaid Services was formerly known as the Health Care Financing Administration or HCFA.

require the providers, in exchange for receiving Medicare payments,[4] to refrain from charging beneficiaries for "items or services" already paid by Medicare. 42 U.S.C. § 1395cc (a)(1)(A).

¶ 8. Hospitals and other medical services providers under contract charge each patient at the providers' standard rates for the actual services rendered, and then Medicare reimburses the providers at the previously contracted Medicare reimbursement rates. After Medicare has reimbursed the services providers, the providers are prohibited from trying to collect the remaining balance—the difference between the billed costs of treatment and the Medicare reimbursement payments. *Id.* They are contractually obligated to accept the Medicare reimbursement payments as a condition of their participation in the Medicare system.[5] *See id.*

¶ 9. One component of the Medicare system is Medicare Part A, which provides coverage to beneficiaries for hospital expense, post-hospitalization care, and related nursing care. *See* 42 U.S.C. § 1395d(a). Medicare Part A provides coverage for 150 total days of inpatient care, 90 days of which are renewable for each "spell of

---

[4] Most hospitals are paid according to a prospective payment rate system under 42 U.S.C. § 1395ww(d). Pursuant to this system, Medicare generally pays hospitals for their services at a predetermined rate regardless of the actual level of care provided. *Id.* This predetermined rate is based on a classification system used by hospitals when admitting patients—the "Diagnostic Related Group" (DRG) classification system. *Id.*

[5] The term "balance billing," as Judge McMahon stated, "refers to the [unlawful] billing of the patient [for the outstanding balance] in the face of these requirements." *See* 42 U.S.C. 1395cc(a)(1)(A).

60

illness"[6] that results in subsequent hospitalization and 60 days of which are considered "lifetime reserve days" expendable any time the beneficiary is hospitalized for more than 90 days during a benefit period. *See* 42 U.S.C. § 1395d(a)(1); 42 C.F.R. § 409.61(a)(2) (2004).

¶ 10. Medicare Part A covers most of the expense incurred during a beneficiary's hospitalization, but beneficiaries are required to pay the hospital a deductible during the first 60 days of inpatient care. *See* 42 U.S.C. § 1395e. Beginning the 61st day of inpatient care, including any lifetime reserve days, beneficiaries are required to make co-payments to the hospital. See *id.* After exhausting all 150 days of coverage, Medicare stops paying Part A expense, at least until a new "spell of illness" begins. *See* 42 U.S.C. §§ 1395d(a)(1), 1395x(a); 42 C.F.R. § 409.61(a)(2) (2004).

¶ 11. Medigap insurance policies were devised to "fill the gaps" in Medicare coverage and provide payment for expenses incurred by beneficiaries that are not otherwise paid for by Medicare. In general, Medigap policies provide coverage for, among other expense, a patient's Medicare co-payments and deductibles as well as "all Medicare Part A eligible expenses[7] for hospital-

---

[6] A beneficiary's "spell of illness" begins on the first day of inpatient care, "which occurs in a month for which he is entitled to benefits under Part A," and it ends 60 days after the beneficiary is released from inpatient care. 42 U.S.C. § 1395x(a). Each time a beneficiary experiences a new "spell of illness," he is entitled to at least 90 days of coverage. *See* 42 U.S.C. § 1395d(a)(1).

[7] "Medicare eligible expenses means health care expenses which are covered by Medicare, recognized as medically necessary and reasonable by Medicare, and which may or may not be fully reimbursed by Medicare." Wis. Admin. Code § INS 3.39(3)(d) (Aug. 1997).

ization not covered by Medicare." *See* Wis. Admin. Code § INS 3.39(5)(c) (Aug. 1997).[8] While most states have been required to adopt certain federally mandated regulations governing Medigap policies, Wisconsin was granted a waiver after Congress found that this state "already had acceptable programs in place" to regulate such policies. H.R. Rep. No. 104–79(II), at 2 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 273. Therefore, Wisconsin is required to update its administrative rules in light of the federal guidelines, but it is not governed by those federal guidelines. *See* Medicare Program; Recognition of NAIC Model Standards for Regulation of Medicare Supplemental Insurance, 63 Fed. Reg. 67,078, 67,079 (Dec. 4, 1998).

## B. Kathleen Ledger's Hospitalization

¶ 12. In May 2000 Kathleen Ledger was admitted to Froedtert Hospital in Milwaukee for a kidney transplant.[9] She remained at Froedtert until September 15, 2000, at which time she was transferred to Vencor Hospital, a long-term care facility in Milwaukee. Days later, on September 25, she was unexpectedly readmitted to Froedtert for further treatment relating to the

---

[8] All subsequent references to the Wisconsin Administrative Code are to the August 1997 version unless otherwise indicated.

[9] Upon admission to the hospital, Kathleen signed a "Conditions of Admission" form for the treatment she was to receive. As part of that agreement, Kathleen was required to assign her rights to receive medical benefits to the hospital. The pertinent part of the agreement reads as follows: "[B]y signing below, I authorize payment to be made directly to [Froedtert] for the benefits otherwise payable to me by any third party including major medical benefits." For this reason, the dispute here is between the hospital and the insurance company rather than between Kathleen, or her successors, and the insurance company.

transplant. She remained hospitalized at Froedtert for two days, and then was released back to the care of Vencor on September 27, 2000.

¶ 13.   On October 26, 2000, after remaining at Vencor for nearly a month, Kathleen was readmitted to Froedtert. A biopsy of her kidney revealed renal cell carcinoma—the most common form of kidney cancer in adults. She remained at Froedtert for the next several months receiving treatment. Kathleen died at Froedtert on February 12, 2001.

¶ 14.   When Kathleen was initially admitted to Froedtert in May 2000, she was eligible for Medicare benefits, including benefits under Part A. As a result, Medicare paid all her inpatient hospital expense, with the exception of co-payments and the deductible, until those benefits were exhausted. However, Kathleen's Medicare Part A benefits, including the lifetime reserve days, were exhausted after October 14, 2000, while she was being cared for at Vencor Hospital.

¶ 15.   Therefore, Kathleen was ineligible for Medicare Part A benefits when she was readmitted to Froedtert on October 26, 2000. She had exhausted her 150 days of coverage, and her renewable days of coverage were not reset as she remained under the same "spell of illness." *See* 42 U.S.C. § 1395x(a) (stating that a "spell of illness" ends 60 days after the beneficiary is released from an inpatient care facility).

¶ 16.   As noted, Kathleen purchased her Medigap policy from National States in 1998, well before the relevant times at issue in this case. National States' Medigap policy contained the following provision with regard to inpatient hospital expense: "If maximum benefits have been paid under Medicare for in-patient hospital expense, including the lifetime reserve days, *we will pay all further expense incurred for hospital*

63

*confinement that would have been covered by Medicare Part A.*" (Emphasis added.) This policy was Kathleen's only form of hospitalization coverage once she was readmitted to Froedtert on October 26, 2000.

¶ 17.  Between October 26, 2000, and February 12, 2001, Kathleen accumulated $267,074.93 in medical bills during her inpatient stay at Froedtert.[10] Of this total, $63,040.05 was paid by Medicare Part B and is not at issue; another $73,309.25 was paid by National States and also is not an issue in this case.[11] The remaining $130,725.63 is outstanding and is the crux of this dispute.

¶ 18.  According to National States, it satisfied its obligations under the Medigap policy because it paid "all further expense" that Medicare would have paid. However, National States paid Froedtert according to the Medicare reimbursement rate rather than the standard rate at which Froedtert billed Kathleen. The $130,725.63 balance represents the difference between Froedtert's billing of Kathleen according to its standard rate and the amount paid by National States at the Medicare reimbursement rate.

C.  Procedural Posture

¶ 19.  On February 3, 2003, after receiving several statements from Froedtert demanding payment of his wife's outstanding balance, Loren Ledger, Kathleen's

---

[10] In addition, Kathleen paid a $2,800 co-payment as required by the Medigap policy. That amount is not reflected in her total bill and is not at issue in this appeal.

[11] This amount represents payment of Kathleen's medical bills according to the Medicare reimbursement rate. National States has never argued that it was not obligated to pay this amount on behalf of Kathleen.

husband, filed a complaint with the Wisconsin Office of the Commissioner of Insurance (OCI) stating that he believed National States owed the balance of Froedtert's bill under Kathleen's Medigap policy. In response to Loren's complaint, the OCI sent a letter to National States on July 1, 2003, agreeing with Loren that National States did in fact owe Froedtert the remaining balance. Notwithstanding the OCI's response, National States refused to make payment beyond the $73,309.25 it had already paid.

¶ 20. More than five years after Kathleen passed away and about six months before Loren passed away, Froedtert filed the present lawsuit seeking payment of Kathleen's outstanding hospital bills. The suit was filed against National States and Loren, but after Loren had passed away, the Loren Ledger Trust (the Trust) was substituted as a proper party.

¶ 21. On January 15, 2007, following discovery, Froedtert filed a motion for summary judgment against National States. The next day, the Trust filed a motion for summary judgment against National States as well. In support of its motion, Froedtert argued that, because Kathleen's final inpatient stay at Froedtert began after her Medicare Part A benefits had been exhausted, the plain language of National States' policy required it to pay for Kathleen's care at Froedtert's standard rate, not the Medicare reimbursement rate. In response, National States argued that Froedtert was prohibited from charging Kathleen its standard rate and was required to accept the Medicare reimbursement rate as full payment. National States focused its argument on the proposition that, by billing Kathleen according to its standard rate after her Medicare benefits had been exhausted, Froedtert was engaging in the prohibited practice of "balance billing."

65

¶ 22. On March 8, 2007, after reading the motions and the briefs and hearing oral argument, Judge McMahon granted Froedtert's motion for summary judgment.[12] She based her decision on the Medigap policy's language, reading the phrase "that would have been covered by Medicare Part A" to modify the phrase "hospital confinement," rather than the phrase "all further expense incurred." As she explained, "the policy requires that National States pay all the expenses incurred for [Kathleen]'s hospital confinement if it was a hospital stay that would have been covered by Medicare Part A." She continued, "It is the nature of the medical services provided as would be covered by Medicare Part A, not the amount or rate Medicare would have billed."

¶ 23. Judge McMahon supported her decision by referencing the Inpatient Psychiatric Hospital Benefit provision in National States' Medigap policy. She said this provision "demonstrates that National States was aware of how it could limit its payment obligation but [it] chose not to [do so] in the provision at issue in [this] litigation."[13] She continued, "the fact that National

---

[12] Judge McMahon viewed the Trust's motion for summary judgment as joining Froedtert's, and therefore, she did not explicitly rule on the Trust's motion. She did say that granting Froedtert's motion for summary judgment "resolves [the Trust's] claims or the issues there as well." Therefore, while not explicitly ruling on the Trust's motion for summary judgment, the circuit court did dispose of the issues raised therein.

[13] Under Part B of this Medigap policy, there are four benefits provided. One of those benefits covers inpatient psychiatric hospital expenses, and it states, "If you incur expense for hospital confinement as the result of psychiatric disorder, *we will pay your hospital expense at Medicare's reimbursement rate* for up to a maximum of 185 days during your lifetime. This

States managed to clarify that it would only cover expenses at the Medicare reimbursement rate in [the Inpatient Psychiatric] clause of the same policy but failed to do so in the clause at issue here supports the interpretation that full coverage is required."

¶ 24.  In addition to explaining her rationale, Judge McMahon stated that she did not "think this is a case about balance billing . . . . That is not the issue here."

¶ 25.  Ultimately, on April 10, 2007, the circuit court entered judgment against National States, ordering it to pay Froedtert $130,725.63 for Kathleen's outstanding balance, $797.00 for costs and disbursements, and $63,223.58 for statutory interest under Wis. Stat. § 628.46. The judgment entered against National States totaled $194,746.21. National States filed its notice of appeal ten days later.

¶ 26.  The court of appeals affirmed Judge McMahon, but it took a slightly different approach. Like Judge McMahon, the court of appeals quickly dispelled the notion that Froedtert was engaging in "balance billing" practices. *See Froedtert,* 310 Wis. 2d 476, ¶ 10 n.5 ("National States insisted at the trial court, and continues to insist before this court, that this case is about 'balance billing' . . . . National States' continued repetition of this inapplicable argument . . . is curious.").

¶ 27.  The court of appeals then determined that the Medigap policy's clause relating to inpatient hospi-

benefit will apply only after you have exhausted Medicare's coverage for hospital inpatient psychiatric expense." (Emphasis added.) Judge McMahon homed in on the fact that National States explicitly limited its payment obligations to the Medicare reimbursement rate in one clause but did not do so in the clause at issue here.

tal benefits was ambiguous because it could "be read to establish two different obligations."[14] *Id.*, ¶ 27 (citation omitted). Having found the clause ambiguous, the court said it was required to "consider the language from the perspective of what a reasonable insured would expect" and make all inferences in favor of coverage. *Id.* (citations omitted).

¶ 28.  With that in mind, the court of appeals focused on the fact that state administrative rules in effect at the time Kathleen bought her Medigap policy required that Medigap policies sold in Wisconsin provide coverage for "all Medicare Part A eligible expenses" —"which may or may not be fully reimbursed by Medicare"—"for hospitalization not covered by Medicare." *Id.*, ¶ 20 (quoting Wis. Admin. Code § INS 3.39(3)(d) and (5)(c)(12)). The court found the rules significant because "National States could not market this Medicare supplement policy in Wisconsin if it did not comply with Wisconsin OCI regulations." *Id.*, ¶ 28. Therefore, the court of appeals concluded that it was reasonable to assume "that National States intended to comply with [Wisconsin's] regulations," and those administrative rules would have required coverage of Kathleen's bills in this case. *Id.*

---

[14]  National States claims that "all further expenses [sic] incurred" is modified by "that would have been covered by Medicare Part A," which would limit its obligation to paying only Medicare reimbursement amounts. Froedtert reads "covered by Medicare Part A" as modifying "hospital confinement," which would require full payment for hospital confinement if that treatment would have been covered by Medicare Part A before it was exhausted.

*Froedtert Mem'l Lutheran Hosp. v. Nat'l States Ins Co.*, 2008 WI App 58, ¶ 26, 310 Wis. 2d 476, 750 N.W.2d 926.

¶ 29. The court of appeals also looked to other provisions of National States' Medigap policy where it had expressly limited its expense obligations to "Medicare's reimbursement rate" and no "doctors' charges above Medicare-approved amounts." *Id.*, ¶ 30. The court observed that "[t]he policy contains no such exclusion or limitation for hospital charges." *Id.*

¶ 30. Based on the administrative rules in effect at the time National States sold Kathleen its Medigap policy and the fact that the policy expressly limited its amount of coverage in several provisions but did not do so for the provision at issue, the court of appeals construed the ambiguous provision in favor of coverage. *Id.*, ¶¶ 26–31. As a result, the court of appeals affirmed Judge McMahon's judgment against National States for the remaining balance of Kathleen's bills.[15] *Id.*, ¶ 38.

¶ 31. The court of appeals also affirmed the circuit court's award of statutory interest to Froedtert under Wis. Stat. § 628.46(1).[16] *See id.*, ¶¶ 35–38. The

---

[15] Judge Ralph Adam Fine issued a dissenting opinion stating that the policy's language was unambiguous. *Id.*, ¶ 40. Quoting from the Medigap policy, Judge Fine argued that the policy was triggered when Medicare benefits were exhausted, *id.*, ¶ 41, and after it was triggered the policy required National States to pay all " 'further expense incurred for hospital confinement' *provided* that 'further expense' 'would have been covered by Medicare Part A,' " *id.*, ¶ 42. He then reasoned that Medicare "*would not have covered* the charges for which Froedtert Memorial Lutheran Hospital seeks payment from National States." *Id.* According to Judge Fine, "This ends the discussion." *Id.*

[16] Unless otherwise provided by law, an insurer shall promptly pay every insurance claim. A claim shall be overdue if not paid within 30 days after the insurer is furnished written notice of the fact of a covered loss. . . . Any payment shall not be deemed overdue

court of appeals noted that National States relied solely on its own legal interpretations in denying Froedtert full payment, and even in the face of the OCI's rejection of those interpretations, National States never changed its position. *Id.*, ¶¶ 35–36. According to the court, National States' attempts to justify its denial of payment did "not create a fairly debatable question as to whether payment was due." *Id.*, ¶ 36. Ultimately, the court of appeals concluded that "National States had a clear and obvious obligation under its policy and the applicable law. National States did not have 'reasonable proof' that it '[wa]s not responsible for the payment.'" *Id.*, ¶ 37 (quoting Wis. Stat. § 628.46(1)). Therefore, the court of appeals affirmed the circuit court's award of 12 percent interest pursuant to Wis. Stat. § 628.46(1). *Id.*

¶ 32. Following the court of appeals decision, National States petitioned this court for review, which we granted on June 10, 2008.

## II. STANDARD OF REVIEW

¶ 33. We review summary judgment decisions de novo, applying the same methodology as the circuit court. *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315–17, 401 N.W.2d 816 (1987). In this case, we apply that methodology while interpreting an insurance contract. The interpretation of an insurance contract also

when the insurer has reasonable proof to establish that the insurer was not responsible for the payment, notwithstanding that written notice has been furnished to the insurer. . . . All overdue payments shall bear simple interest at the rate of 12 [percent] per year.

Wis. Stat. § 628.46(1).

is a question of law that we review de novo. *Frost v. Whitbeck*, 2002 WI 129, ¶ 5, 257 Wis. 2d 80, 654 N.W.2d 225.

## III.  DISCUSSION

¶ 34.  This case presents the question of whether National States' Medigap policy obligates it to pay Froedtert for the services rendered to Kathleen between October 26, 2000, and February 12, 2001, according to Froedtert's standard rate, or whether National States may pay Froedtert at the lower Medicare reimbursement rate. To answer a question of this nature, we look first to the language of the policy. *Plastics Eng'g Co. v. Liberty Mut. Ins. Co.*, 2009 WI 13, ¶ 27, 315 Wis. 2d 556, 759 N.W.2d 613; *Danbeck v. Am. Family Mut. Ins. Co.*, 2001 WI 91, ¶ 10, 245 Wis. 2d 186, 629 N.W.2d 150. The language of the policy governs unless it is supplanted by state or federal law. *See* Wis. Stat. § 631.15(3m) ("A policy that violates a statute or rule is enforceable against the insurer as if it conformed to the statute or rule."). Of course, the language of a policy may not be entirely clear as applied to a given set of facts. In that event, the court employs various canons of contract construction. *See Hull v. State Farm Mut. Auto. Ins. Co.*, 222 Wis. 2d 627, 636–37, 586 N.W.2d 863 (1998); *Kremers-Urban Co. v. Am. Employers Ins. Co.*, 119 Wis. 2d 722, 735–36, 351 N.W.2d 156 (1984).

¶ 35.  The controversy here involves the interpretation of a provision in the Medigap policy's section supplementing Medicare Part A benefits. The provision reads as follows: "[Part B](4) BENEFITS AFTER MEDICARE STOPS – If maximum benefits have been paid under Medicare for in-patient hospital expense,

71

including the lifetime reserve days, *we will pay all further expense incurred for hospital confinement that would have been covered by Medicare Part A*." (Emphasis added.)

¶ 36. National States contends that this language is a contractual promise to pay the same amount for hospital benefits that Medicare would have paid had Kathleen still been eligible to receive those Medicare benefits. National States follows the analysis of Judge Fine's dissent in the court of appeals, arguing that the Medigap policy, when read completely, is unambiguous in providing coverage for only the amount of expense that Medicare would pay if Kathleen were still eligible for Medicare benefits. National States asserts that its policy provides coverage for certain eligible expense— namely, inpatient hospital expense—but only at Medicare reimbursement rates. It supports this position by arguing that the Medigap policy phrase "all further expense incurred" is modified by the phrase "that would have been covered by Medicare Part A."

¶ 37. In contrast, Froedtert maintains that the policy language at issue unambiguously provides payment for the full amount of Kathleen's bill. It argues that the policy's phrase "hospital confinement" is modified by the phrase "that would have been covered by Medicare Part A." Under this reading, National States is required to make full payment for Kathleen's entire hospital confinement if such confinement would otherwise have been covered by Medicare Part A prior to the exhaustion of benefits. Froedtert contends that this plain language reading is supported by the fact that the administrative rules in effect at the time National States sold Kathleen its Medigap policy appear to have required that all Medigap policies sold in Wisconsin provide full coverage for such hospital expense. Also,

72

Froedtert supports its argument by noting that the Medigap policy expressly limited its amount of payment in several other provisions but did not do so in the provision at issue here.

¶ 38. Before proceeding to our primary analysis, we must make clear that we do not see this case as a dispute over "balance billing." National States spends the majority of its almost 60–page brief arguing that this is a case about "balance billing." It asserts that the court of appeals acknowledged only one type of "balance billing," which National States admits is not at issue in this case.[17] *See Froedtert,* 310 Wis. 2d 476, ¶ 10 n.5; *see also* 42 U.S.C. 1395cc(a)(1)(A).

¶ 39. However, National States claims there is a second type of "balance billing" that prohibits a hospital from collecting "the balance of its standard charges from a patient who was formerly covered by Medicare after *expiration of the Medicare benefits period.*" National States argues that, by billing Kathleen according to its standard rate rather than according to the Medicare reimbursement rate, Froedtert was engaging in an impermissible "balance billing" practice. We must note that National States presents little authority for its position under Wisconsin law; rather, it cites model

---

[17] The court of appeals defined "balance billing" as a billing practice that takes place when the hospital or other medical services provider bills the patient for the difference between the amount Medicare reimbursed the services provider for the services rendered and the amount that would be due for the services rendered using the provider's standard billing rate. *Froedtert,* 310 Wis. 2d 476, ¶ 10 n.5. Because Medicare paid none of Kathleen's inpatient hospital expense during her final stay at Froedtert, this type of "balance billing" is not at issue in this case. *Id.*

regulations that Wisconsin did not adopt and court cases from other jurisdictions that are factually inapposite.

¶ 40. Because there is no Wisconsin authority that prohibited Froedtert from billing Kathleen according to its standard rate when she arrived at Froedtert on October 26, 2000, after her Medicare Part A benefits had been exhausted, we forgo the invitation to create such authority on our own accord. We conclude that National States' "balance billing" discussion is not applicable to the present dispute and analyze it no further.

A.   National States' Liability for the Remaining Balance

¶ 41. Generally, "language in an insurance contract is given its common, ordinary meaning, that is, what the reasonable person in the position of the insured would have understood the words to mean." *Folkman v. Quamme,* 2003 WI 116, ¶ 17, 264 Wis. 2d 617, 665 N.W.2d 857 (citations and quotations omitted). "We interpret undefined words and phrases of an insurance policy as they would be understood by a reasonable insured." *Acuity v. Bagadia,* 2008 WI 62, ¶ 13, 310 Wis. 2d 197, 750 N.W.2d 817 (citation omitted). If the words or provisions of an insurance contract are capable of "more than one reasonable construction, they are ambiguous." *Lisowski v. Hastings Mut. Ins. Co.,* 2009 WI 11, ¶ 9, 315 Wis. 2d 388, 759 N.W.2d 754. If an insurance contract is ambiguous as to coverage, "it will be construed in favor of the insured." *State Farm Mut. Auto Ins. Co. v. Langridge,* 2004 WI 113, ¶ 15, 275 Wis. 2d 35, 683 N.W.2d 75; *Folkman,* 264 Wis. 2d 617, ¶ 16 ("Insurers have the advantage over insureds be-

cause they draft the contracts. Thus, courts construe ambiguities in coverage in favor of the insureds . . . .") (citation omitted).

¶ 42.   The parties in this case have submitted separate, conflicting interpretations of the policy language. As noted, the policy states that after Medicare benefits have been exhausted, National States "will pay all further expense incurred for hospital confinement that would have been covered by Medicare Part A." Froedtert interprets this language to mean that National States must pay for all hospital expense that would have been covered under Medicare Part A, even if such expense is billed according to the hospital's standard rate. National States argues that it is liable for that expense but only at the Medicare reimbursement rate. We see both of these interpretations as reasonable, and thus, we deem the policy language ambiguous. *See Lisowski,* 315 Wis. 2d 388, ¶ 9.

¶ 43.   When policy language is ambiguous, the result intended by those who drafted the language is uncertain. However, because the insurer is in a position to write its insurance contracts with the exact language it chooses—so long as the language conforms to statutory and administrative law—ambiguity in that language is construed in favor of an insured seeking coverage. *See Folkman,* 264 Wis. 2d 617, ¶ 16. Consequently, we hold that National States is liable to Froedtert for the full amount of Kathleen's hospital expense at Froedtert's standard billing rate.

¶ 44.   Having made this determination by using a standard canon of construction, we have no obligation to support it by additional analysis. *See Langridge,* 275 Wis. 2d 35, ¶ 15; *Folkman,* 264 Wis. 2d 617, ¶ 16.

Nonetheless, the application of a standard canon of construction without more sometimes leaves an impression of arbitrariness. Here, there is quite a bit more to support our conclusion.

¶ 45. First, there are other provisions in the policy that *clearly* limit National States' obligation to pay, while the provision at issue does not. For instance, the psychiatric benefits provision details the policy's coverage for a particular kind of "hospital confinement" and limits the insurer's payment to expense "at Medicare's reimbursement rate."[18] The provision also limits total days of coverage following the exhaustion of Medicare Part A benefits.

¶ 46. This provision stands in sharp contrast to the provision at issue in this case: "Benefits After Medicare Stops—If maximum benefits have been paid under Medicare for inpatient hospital expenses . . . we will pay all further expense incurred for hospital confinement that would have been covered by Medicare Part A." There is no limit as to duration in the provision at issue, and there is no explicit limit as to the payment rate.

¶ 47. Another provision in the policy entitled "Exceptions and Limitations" states the following: *"This policy does not cover loss resulting from . . . doctors' charges above Medicare-approved amounts."* (Emphasis

---

[18] The policy provides:

> Inpatient Psychiatric Hospital Benefit—If you incur expense for hospital confinement as a result of psychiatric disorder, *we will pay your hospital expense at Medicare's reimbursement rate for up to a maximum of 175 days* during your lifetime. This benefit will apply only after you have exhausted Medicare's coverage for hospital inpatient psychiatric expense.

(Emphasis added.)

76

added.) Here again, the policy clearly ties its payment to Medicare-approved amounts.

¶ 48. We see in these provisions that National States is capable of limiting its rate of payment in unmistakable terms, something that it did not do in the provision at issue.

¶ 49. Second, National States' interpretation of the provision at issue would nullify the expectations of a reasonable insured. *See Acuity,* 310 Wis. 2d 197, ¶ 13.

¶ 50. The policy warns insureds in its first paragraph that the policy, "along with Medicare, may not cover all of your medical costs. You should review carefully all policy limitations." The policy then incorporates many clear limitations on payment in addition to the limitation on the inpatient psychiatric hospital benefit and the limitation on doctors' charges. For instance, the "Skilled Nursing Benefits for Medicare—Eligible Confinement" provision reads as follows: "When you incur expense for skilled nursing facility confinement which is eligible under Medicare, we will pay the co-payment amounts specified by Medicare from the 21st through 100th day of confinement." In other words, National States will *not* pay the co-payment for eligible skilled nursing facility confinement during the first 20 days or after the 100th day.

¶ 51. Another provision, the "Prescription Drug Benefit," states:

> When you incur expense for out-patient prescription drugs, we will pay 80 [percent] of the amount in excess of $6,250.00 in each calendar year. The deductible of $6,250.00 will be applied once in each calendar year. The out-patient drugs must be prescribed by a doctor for the treatment of a sickness or injury covered by this policy.

This provision makes the amount of outpatient prescription drug expense to be borne by the insured quite specific.

¶ 52. A third provision reads: "This policy does not cover the Medicare Part A or Medicare Part B deductibles." This language is not ambiguous.

¶ 53. Compare the provision at issue in this case. It creates an expectation: "If maximum benefits have been paid under Medicare for in-patient hospital expense . . . *we will pay all further expense incurred for hospital confinement . . . .*" According to National States, the additional wording—"that would have been covered by Medicare Part A"—creates an exception to the insurer's promise, so that the provision effectively reads: we will pay all further expense incurred for hospital confinement except for an expense billed at greater than the Medicare reimbursement rate (which, in this case, amounts to about 65 percent of the bill, e.g., $130,725.63 plus the co-payment); this amount the insured must pay.

¶ 54. We do not believe a reasonable insured would expect this result to follow the words "we will pay all further expense incurred for hospital confinement." *See id.* Any intended exception or qualification is too subtle in the context of the entire policy to warn the insured of the limitation on the insurer's liability.

¶ 55. The court of appeals relied on the administrative rules then in effect when Kathleen purchased her Medigap policy to support the position that we now affirm. We acknowledge that Wis. Admin. Code § INS 3.39(5)(c)(12),[19] read together with Wis. Admin. Code

---

[19] Today's version of the Administrative Code requires that Medigap policies, after exhaustion of all Medicare Part A benefits, provide coverage for "all Medicare Part A expenses for

78

§ INS 3.39(3)(d),[20] can be interpreted to require that Medigap policies cover all unpaid hospital expense "recognized as medically necessary and reasonable by Medicare," irrespective of the billing rate.[21] Nonetheless, Judge Fine's dissent, referenced *supra* at ¶ 31 n.15 and *infra* at ¶ 63, shows that the meaning of the rules is not free from doubt, and thus, we decline to rely on the administrative rules for this decision.

¶ 56. In sum, there is a good deal of evidence within the policy to support our determination that an ambiguous provision on payment of hospital confinement expense must be construed against the insurer in favor of coverage. *See Langridge,* 275 Wis. 2d 35, ¶ 15; *Folkman,* 264 Wis. 2d 617, ¶ 16. We believe that a reasonable insured, after purchasing the Medigap policy in this case, would expect that she would be provided coverage for *all* further expense incurred for

hospitalization not covered by Medicare to the extent the hospital is permitted to charge by federal law and regulation and subject to the Medicare reimbursement rate." Wis. Admin. Code § INS 3.39(5)(c)(12) (June 2005).

[20] The current version of the Code states that " 'Medicare eligible expenses' means health care expenses that are covered by Medicare Parts A and B, recognized as medically necessary and reasonable by Medicare, and that may or may not be fully reimbursed by Medicare." Wis. Admin. Code § INS 3.39(3)(s) (June 2005).

[21] We note that this argument does not necessarily apply across-the-board to all Medicare Part A benefits. For example, Medigap policies sold under the then-existing administrative rules required that those policies provide coverage for "at least 175 days per lifetime for inpatient psychiatric hospital care." *See* Wis. Admin Code § INS 3.39(5)(c)(1). Unlike the previous version of the administrative rule, § INS 3.39(5)(c)(1) is silent with regard to "Medicare eligible expenses" or any other language that dictates the rate of payment that must be covered.

hospital confinement after Medicare payments had been exhausted. *See Acuity*, 310 Wis. 2d 197, ¶ 13. Consequently, we affirm the decision of the court of appeals to impose judgment against National States for the entire balance remaining on Kathleen's account with Froedtert.

B.   Statutory Interest

¶ 57.   The circuit court imposed statutory interest of $63,223.58 running from March 5, 2003, through March 15, 2007, pursuant to Wis. Stat. § 628.46. The March 5, 2003, date represents 30 days after Loren filed his complaint with the OCI on February 3, 2003.

¶ 58.   Twelve percent interest was imposed upon National States after the circuit court granted summary judgment to Froedtert on the issue of Kathleen's hospital expense. Froedtert's complaint did not ask for 12 percent interest under Wis. Stat. § 628.46. Rather, Froedtert requested this interest when it prepared a draft judgment for the circuit court after summary judgment.

¶ 59.   Wisconsin Stat. § 628.46(1)[22] imposes an annual rate of 12 percent interest on any insurer who

---

[22] Wisconsin Stat. § 628.46 reads in part:

(1) Unless otherwise provided by law, an insurer shall promptly pay every insurance claim. A claim shall be overdue if not paid within 30 days after the insurer is furnished written notice of the fact of a covered loss and of the amount of the loss. If such written notice is not furnished to the insurer as to the entire claim, any partial amount supported by written notice is overdue if not paid within 30 days after such written notice is furnished to the insurer. Any part or all of the remainder of the claim that is subsequently supported by written notice is overdue if not paid within 30 days after written notice is furnished to the insurer. Any payment shall

fails to pay a claim within 30 days of being provided written notice of such claim. However, a claim cannot "be deemed overdue when the insurer has reasonable proof to establish that the insurer is not responsible for the payment." *Id.* In *Kontowicz v. American Standard Insurance Co.*, 2006 WI 48, ¶ 48, 290 Wis. 2d 302, 714 N.W.2d 105, this court stated that " '[r]easonable proof' means that amount of information which is sufficient to allow a reasonable insurer to conclude that it may not be responsible for payment of a claim." Generally, reasonable proof is equated with whether coverage is considered "fairly debatable." *Id.* (quoting *Allstate Ins. Co. v. Konicki,* 186 Wis. 2d 140, 160, 519 N.W.2d 723 (Ct. App. 1994)). Thus, the critical inquiry is whether National States' obligation to pay all Kathleen's inpatient hospital care expense at Froedtert's standard rate was "fairly debatable."

---

not be deemed overdue when the insurer has reasonable proof to establish that the insurer is not responsible for the payment, notwithstanding that written notice has been furnished to the insurer. For the purpose of calculating the extent to which any claim is overdue, payment shall be treated as being made on the date a draft or other valid instrument which is equivalent to payment was placed in the U.S. mail in a properly addressed, postpaid envelope, or, if not so posted, on the date of delivery. All overdue payments shall bear simple interest at the rate of 12 percent per year.

(2) Notwithstanding sub. (1), the payment of a claim shall not be overdue until 30 days after the insurer receives the proof of loss required under the policy or equivalent evidence of such loss. The payment of a claim shall not be overdue during any period in which the insurer is unable to pay such claim because there is no recipient who is legally able to give a valid release for such payment, or in which the insurer is unable to determine who is entitled to receive such payment, if the insurer has promptly notified the claimant of such inability and has offered in good faith to promptly pay said claim upon determination of who is entitled to receive such payment.

¶ 60. For several reasons, we think the question of coverage, or more accurately the rate to be paid for coverage, is fairly debatable in this case.

¶ 61. First, in agreement with the majority of the court of appeals, we have determined that the policy provision at issue is *ambiguous*. *Supra* ¶ 42; *see also Froedtert*, 310 Wis. 2d 476, ¶¶ 26–27. Both parties submitted reasonable interpretations of the provision. Moreover, the more persuasive reading of the provision relies on evidence extraneous to the provision itself.

¶ 62. When we look at the first part of the provision—"If maximum benefits have been paid under Medicare for in-patient hospital expenses, *including the lifetime reserve days*"—we see that the phrase "including the lifetime reserve days" does not relate to the immediately preceding words: "in-patient hospital expenses." (Emphasis added.) Rather, the "including" phrase relates back to "maximum benefits," nine words earlier. Hence, National States can point to a pattern of suspect drafting to support its view that the phrase "that would have been covered by Medicare Part A" relates back to the phrase "all further expense incurred," not the immediately preceding words.

¶ 63. Second, in his dissent, Judge Fine sided with the insurer in his belief that the provision at issue was *unambiguous*. Judge Fine was not deterred in his analysis by the existing administrative rule. Indeed, he used the rule to buttress his argument.[23] Judge Fine's

---

[23] The Wisconsin Administrative Code provisions, quoted by the Majority at ¶¶ 20, 22, and 24 n.10, are wholly consistent with the plain reading of National States' obligations here. First, Wis. Admin. Code § INS 3.39(3)(d) (1997) defined "Medicare eligible expenses" to mean "health

care expenses *which are covered by Medicare,* recognized as
medically necessary and reasonable by Medicare, and which
may or may not be fully reimbursed by Medicare." (Empha-
sis added.) Thus, in order to be "Medicare eligible expenses,"
the expenses must be "covered by Medicare" because those
expenses are determined by Medicare to be "necessary and
reasonable." Medicare's agreement with Froedtert promises
to pay Froedtert, and Froedtert promises to accept,
Medicare's determination of what is "reasonable and neces-
sary" irrespective of what Froedtert might bill others not
protected by the Medicare umbrella. The appended clause,
"which may or may not be fully reimbursed by Medicare"
merely means that once Medicare coverage is exhausted, as
is the case here, Medicare will no longer reimburse the
healthcare provider for the whole of the Medicare-approved
"necessary and reasonable" expense. To say that the clause,
"which may or may not be fully reimbursed by Medicare"
means what the Majority construes it to mean, ignores the
"which are covered by Medicare" requirement, which is, as
we have seen, congruent with the "that would have been
covered by Medicare Part A" proviso in the National States
policy.

Wisconsin Admin. Code § INS 3.39(5)(c)12. (2001) is also
consistent with the National States policy. As the Majority recog-
nizes in ¶ 24 n.10, that regulation reads: "Upon exhaustion of all
Medicare hospital inpatient coverage including the lifetime reserve
days, [the policy must provide] coverage of all Medicare Part A
eligible expenses for hospitalization not covered by Medicare." The
expenses must be *"eligible"* under "Medicare Part A." There is no
dispute here but that what Froedtert seeks to recover from National
States are not "Medicare Part A eligible expenses."

Although Mrs. Ledger agreed upon her admittance to Froed-
tert to be "financially responsible for all charges incurred" by her
during her stay at the hospital, her undertaking does not negate
her contract with National States, nor could it. A simple example
will make this clear. Assume a bonding company guarantees a

able," but we think his dissent is a relevant consideration.[24]

¶ 64. Third, the coverage issue in this case is a matter of first impression in Wisconsin. *See United States Fire Ins. Co. v. Good Humor Corp.,* 173 Wis. 2d 804, 835–36, 496 N.W.2d 730 (Ct. App. 1993) (using the fact that the dispute was a matter of first impression as partial justification for finding the question of coverage fairly debatable). By accepting National States' petition for review, this court signaled that it thought National States' argument was worth serious consideration.

¶ 65. Before the court granted the petition for review, the OCI revised its administrative rule to clarify the required coverage in Medigap policies. *See, supra,* notes 19 and 20. This modification demonstrates that a major policy question was embodied in the interpretation of both the provision at issue and the administrative rule. We think the absence of controlling precedent and the importance of the unsettled policy issue gave National States " 'a right to litigate this matter without

contractor's obligation to build a building, with a liability limit of $100,000. Assume further that the contractor's contract with the owner obligates the contractor to complete the construction or be liable for all the costs of delay and remediation. Assume still further that those costs are $500,000. Could anyone seriously argue that the bonding company would be liable for the $500,000 rather tha[n] its $100,000–undertaking? Of course not. That is the situation we have here.

*Froedtert,* 310 Wis. 2d 476, ¶ 42 n.1 (Fine, J., dissenting).

[24] We do not claim that every time there is a divided court on whether coverage exists under an insurance contract that the coverage is then "fairly debatable." Instead, the fact that there was a well-reasoned dissenting opinion in this case regarding the issue of coverage is relevant evidence to consider in making the determination of whether coverage was actually "fairly debatable."

facing prejudgment interest.' " *See Good Humor,* 173 Wis. 2d at 835–36 (quoting the Brown County Circuit Court, Vivi Dilweg, Judge).

¶ 66.  In light of these considerations, we determine that the issue of coverage in this case was "fairly debatable" and National States should not be penalized for exercising its right to litigate the matter. *See Fritsche v. Ford Motor Credit Co.,* 171 Wis. 2d 280, 306 n.7, 491 N.W.2d 119 (Ct. App. 1992). Therefore, we reverse the court of appeals' affirmance of the circuit court's judgment awarding Froedtert 12 percent statutory interest.

¶ 67.  Because the circuit court awarded 12 percent interest under Wis. Stat. § 628.46, it did not consider Froedtert's eligibility for prejudgment interest under other law. *See Olguin v. Allstate Ins. Co.,* 71 Wis. 2d 160, 168, 237 N.W.2d 694 (1976) ("The oft-stated rule in regard to pre-judgment interest is that it is proper when there is reasonably certain standard of measurement by the correct application of which one can ascertain the amount he owes.") (internal quotations and citation omitted); *Good Humor,* 173 Wis. 2d at 833–35. We remand the case to the circuit court for its determination of that issue and other actions consistent with this opinion.

## IV.  CONCLUSION

¶ 68.  We conclude that the "Benefits After Medicare Stops" provision in National States' 1998 Medigap policy is ambiguous and must be construed against the insurer to provide coverage at Froedtert's standard rate for Kathleen's hospital confinement at Froedtert after her Medicare Part A benefits were exhausted. This construction is supported by the sharp contrast be-

tween the uncertain limitations in the provision at issue and the clear limitations contained in other provisions of the policy. It is also supported by the expectations of a reasonable insured that this policy would pay for "all further expense incurred" for hospital confinement. We do not agree, however, that National States is subject to interest under Wis. Stat. § 628.46. The issue of the policy's coverage above the Medicare reimbursement rate was fairly debatable in light of all the facts and circumstances of this case.

¶ 69. *By the Court.*—The decision of the court of appeals is affirmed in part, reversed in part, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.