In the

# United States Court of Appeals

## For the Seventh Circuit

No. 22-2577

FROEDTERT HEALTH, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

FACTORY MUTUAL INSURANCE COMPANY,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:21-cv-713 — **Brett H. Ludwig**, *Judge*.

ARGUED JANUARY 24, 2023 — DECIDED JUNE 2, 2023

Before HAMILTON, SCUDDER, and JACKSON-AKIWUMI, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Before us is an appeal presenting a difficult question of insurance coverage. Froedtert Health, a Wisconsin-based healthcare system, seeks reimbursement for $85 million in costs incurred during the early months of the COVID-19 pandemic under an all-risks insurance policy issued by Factory Mutual Insurance Company. The Factory Mutual policy is complex in its structure and contains

language in one place broadly excluding COVID-related losses while, in another place, supplying limited coverage for portions of those same losses. In the end, and after immersing ourselves in the policy's dense detail, we agree with the district court that Froedtert failed to state a claim for coverage beyond the $1 million it received under a limited coverage provision for communicable diseases. So we affirm.

# I

## A

When the COVID-19 pandemic began, Froedtert found itself facing urgent and overwhelming demand to provide life-saving care. Meeting that demand required substantial investments in personal protective equipment, waste disposal mechanisms, and cleaning and sanitation supplies. Froedtert also modified its emergency room layout and adapted its facilities to provide testing and screening for COVID-19. Like many other hospitals, Froedtert changed the scope of available services, including by pausing nonemergency, elective procedures. In total, Froedtert spent $85 million on these COVID-related costs.

Froedtert sought coverage for the entirety of these costs under its all-risks policy with Factory Mutual. The insurer denied the claim, determining that the COVID-related losses did not constitute a direct physical loss triggering the general coverage provision and $2 billion limit. But Factory Mutual did pay Froedtert the maximum $1 million sublimit under a separate, additional coverage provision for losses from communicable disease response. Litigation then ensued.

B

Froedtert filed this diversity action in federal district court seeking a declaratory judgment establishing its coverage for the entire amount of its insurance claim. Froedtert contended that the policy's general coverage provision applied to cover the full $85 million of its claim, not just the $1 million it received under the policy's separate provision subject to the significantly lower sublimit.

Factory Mutual moved to dismiss the case for failure to state a claim, and the district court granted the motion. The district court agreed with Factory Mutual that COVID-19 did not cause physical damage or loss to Froedtert's insured facilities, as required for general coverage. The district court also reasoned that even if the policy covered COVID-19 under its general grant of coverage, these losses would be excluded by the policy's broad exclusion of losses from contamination.

Froedtert appeals.

**II**

A

The Factory Mutual insurance policy at issue—a so-called all-risks policy—conferred broad coverage to Froedtert during the period from July 1, 2019, to July 1, 2020, and allowed for recovery (under its general provision) of up to $2 billion per occurrence.

We start by describing the policy's overarching structure. It begins with a general grant of coverage that protects against physical loss or damage to Froedtert's insured property, both real and personal. From there the policy excludes several types of risks from the broad general coverage provision.

Some exclusions concern specific types of property, including, for example, losses related to electronic data, watercraft, and animals. Other exclusions concern the means by which the insured property was damaged, such as by nuclear reaction or acts of terrorism. We will come to focus on one such exclusion for losses from contamination.

In a separate, later section, the policy identifies additional coverages that are provided beyond the general grant of coverage. Payment under one of the 30-plus additional coverage provisions does not alter the policy's overall $2 billion limit, and these provisions are themselves subject to exclusions. This appeal requires a close look at the additional coverage provision for "Communicable Disease Response." Factory Mutual determined that this provision provided $1 million in coverage to Froedtert—the maximum available under the specific sublimit for this additional coverage provision.

B

Wisconsin law governs this case, and both parties agree on the cornerstone principles. Insurance policies are contracts and, as such, we must interpret the Factory Mutual policy to "give effect to the parties' intent, construing the policy as it would be understood by a reasonable person in the same position as the insured." *Colectivo Coffee Roasters, Inc. v. Soc'y Ins.*, 974 N.W.2d 442, 446 (Wis. 2022). Ambiguities should be resolved in favor of the insured, here Froedtert. See *Froedtert Mem'l Lutheran Hosp. v. Nat'l States Ins. Co.*, 765 N.W.2d 251, 261 (Wis. 2009) (explaining that a term is ambiguous if susceptible to more than one reasonable interpretation). We are mindful, too, that Wisconsin law requires us to read the policy in its entirety: "A term that is potentially ambiguous when read in isolation may be clarified by reference to the policy as

a whole." *Wadzinski v. Auto-Owners Ins. Co.*, 818 N.W.2d 819, 826 (Wis. 2012).

Wisconsin courts generally follow a three-step process to interpret insurance policies. First, the court determines whether the policy provides an initial grant of coverage. *Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 73 (Wis. 2004). If the policy covers the claim, the court next looks to see whether any exclusions apply. See *id.* Finally, the court considers whether any portion of the policy would reinstate coverage otherwise left out by the initial grant or by an exclusion. See *id.* We follow that same analytical course here.

## C

The particulars of Factory Mutual's policy, including its precise language, very much matter. Indeed, the only way to decide a case like this is roll up our sleeves and wade into fine details. Allow us an extra ounce of patience as we do so.

*General Coverage.* We begin with the policy's general grant of coverage. The policy insures Froedtert's property up to $2 billion "against all risks of physical loss or damage, except as hereinafter excluded." The policy does not expressly define physical loss or damage, but several courts, including the Supreme Court of Wisconsin, have understood "physical loss" requirements to exclude coverage for losses from the presence of COVID-19. See, *e.g.*, *Colectivo Coffee Roasters, Inc.*, 974 N.W.2d at 447 ("[F]or a harm to constitute a physical loss of or damage to the property, it must … alter the property's tangible characteristics."); *Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*, 20 F.4th 327, 333 (7th Cir. 2021) (concluding that "'direct physical loss' requires a physical alteration to property" under Illinois law).

Indeed, our court recently interpreted the same all-risks policy at issue here and concluded that COVID-19 losses do not amount to a physical loss within the meaning of the policy's general coverage provision for "physical loss or damage." See *Stant USA Corp. v. Factory Mut. Ins. Co.*, 61 F.4th 524, 526 (7th Cir. 2023). Our decision in *Stant* does not resolve this appeal, however. The losses at issue are different—Stant sought reimbursement for business interruption losses from the presence of COVID-19 at its customers' properties, whereas Froedtert seeks to recoup the costs it incurred to maintain business operations given the presence of COVID-19 at its facilities. And Factory Mutual's responses are different—Froedtert received partial coverage under the policy's provision conferring additional (though limited) coverage for communicable disease–related losses, whereas Stant did not.

To its credit, Froedtert accepts the rulings of these courts and does not contend that COVID-19 generally causes physical loss or damage. Froedtert instead argues that the specific terms of the Factory Mutual policy require a more expansive reading of physical loss to include losses from COVID-19.

At this early juncture in our analysis, then, suffice it to say that we see no language within the four corners of the general grant of coverage itself that leads us to believe that the parties intended for physical losses to include losses from COVID-19. We have not located any references to communicable diseases, viruses, pandemics, or contamination within the policy's general coverage provision, and Froedtert does not contend that coverage is otherwise conferred based on a reading of the general coverage provision in isolation. So, on the plain text of the primary grant of coverage alone, we conclude that losses from COVID-19 are not generally covered.

*Exclusions from General Coverage.* The policy contains several exclusions from general coverage, and one in particular jumps off the page—losses from contamination. The policy expressly excludes "any cost due to contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy." And the policy expressly defines contamination as "any condition of property due to the actual or suspected presence of," among other things, a "virus." Costs arising from changed property conditions caused by COVID-19, a viral respiratory illness, readily fall under this exclusion to general coverage.

The contamination exclusion indirectly reinforces our initial conclusion that the policy's general coverage provision does not cover losses from COVID-19. Put differently, even if we read the general coverage provision alone to pick up losses from COVID-19, Froedtert's claim would still have to overcome the policy's broad contamination exclusion for Froedtert to claim its full $85 million in losses. All of this leads us to conclude—based solely (at this point in our analysis) on our review of the policy's general provisions and exclusions—that the parties did not intend for COVID-19 losses to fall within the policy's general coverage and $2 billion limit.

The analysis gets much harder from here forward, however, as we must grapple with the contentions Froedtert advances based on the policy's additional coverage provisions and, even more specifically, the additional coverage provided for losses from communicable diseases.

*Additional Coverages.* The provisions for additional coverages follow the policy's general coverage provision and related exclusions. This separate section for "Additional Coverages" begins by explaining that "[t]his Policy includes the

following Additional Coverages for insured physical loss or damage." The parties refer to this language as the "prefatory language." More than 30 additional coverage provisions then follow.

Froedtert puts a spotlight on the policy's additional coverage for "Communicable Disease Response." This provision provides coverage up to $1 million for "the reasonable and necessary costs incurred by the Insured at such location with the actual … presence of communicable disease for the … cleanup, removal and disposal of the actual … presence of communicable diseases from the insured property." Communicable diseases are those "transmissible from human to human by direct or indirect contact." To trigger this additional coverage, access to the insured property must be restricted for more than 48 hours, either by a government order or a decision by an officer of the insured party.

At one level, Froedtert's entitlement to coverage under this communicable disease provision is uncontroversial. Factory Mutual is quick to acknowledge that Froedtert qualified for and indeed received this $1 million of additional coverage for its COVID-19 losses incurred during the applicable policy period. The much harder question concerns the relationship between the policy's general coverage and the Additional Coverages section. The question is difficult because, while the policy's general provision supports a reading that COVID-19 losses are not physical losses under the policy, the prefatory language delineating the policy's additional coverages, including for communicable disease, quite clearly seems to deem those covered losses to be "physical loss or damage." So the issue becomes whether the substance of the prefatory language has effect beyond and outside of the policy's additional

coverage provisions. We ultimately conclude that it does not. Untangling that knot adds substantial complexity to our analysis.

D

Froedtert urges us to define the meaning and scope of "physical loss or damage" in the general coverage provision by looking at the way the policy uses the same language in its Additional Coverages section. Recall that the prefatory language to the Additional Coverages section states that the delineated coverages are "for insured physical loss or damage." Because communicable disease response is one type of additional coverage, Froedtert reasons that the $1 million payment Factory Mutual made for communicable diseases necessarily constitutes coverage for a type of "physical loss." And if that is so, Froedtert continues, it only makes sense to construe the meaning of physical loss the same way when discerning the scope of covered losses under the general grant of coverage.

Froedtert's argument roots itself in policy language and has considerable force. The plain meaning of the prefatory language indicates that communicable disease response costs are a type of physical loss, at least for purposes of the application of the Additional Coverages delineated within the policy. Any other conclusion fails to give effect to the language and its placement within the policy—as an overarching (hence prefatory) paragraph applicable to each type of additional coverage.

Froedtert is right to then invoke the principle requiring a holistic interpretation of the policy. Where "physical loss or damage" is not expressly defined within the general coverage provision, the policy's identification of "communicable

diseases" as qualifying physical losses seems to us to indicate that those same losses constitute "physical loss or damage" within the meaning of the policy's general coverage provision standing alone—before considering any exclusions to general coverage. At the very least, we see the tension between the general coverage provision and the Additional Coverages prefatory language as exposing an interpretive ambiguity that, if read in isolation, we would resolve in Froedtert's favor as the insured party.

But the analysis cannot stop there: it must go further and account for the policy's exclusions to general coverage. Therein lies the insurmountable hurdle for Froedtert.

We do not see how an insured reading the policy holistically as we have would get through the general provision and its exclusions to find general coverage given the policy's expansive contamination exclusion. In clear and precise terms, that exclusion broadly applies to the policy's general coverage to exclude any losses from contaminants, including viruses like COVID-19. We see it as a bridge too far to conclude that the prefatory language to the Additional Coverages section would operate in a way that effectively limits the breadth of the contamination exclusion, even if that same prefatory language is fairly read to define the scope of what constitutes "physical loss or damage" for purposes of the general coverage provision standing alone. The wording of the contamination exclusion does not depend on the definition of "physical loss"—the provision's broad exclusion of "contaminants," which expressly includes viruses, remains unaltered by the prefatory language to the Additional Coverages section. Froedtert points to no other text that changes our view that

COVID-19 is a "virus" falling within the contamination exclusion.

Our reading makes practical sense too. By their terms, the Additional Coverages add coverage for losses not covered elsewhere within the policy. That is the case here: COVID-19 losses fell outside the general coverage provision, if only through the contamination exclusion, and instead were added through a separate, later provision—the communicable disease response provision within the policy's Additional Coverages section. Had COVID-19 losses constituted losses not already excluded by the broad contamination exclusion, the additional coverage for communicable disease response would have provided no new coverage. The $1 million sublimit for communicable disease response costs further reinforces this view. The parties contemplated coverage for the exact losses that Factory Mutual covered here—but they limited coverage to $1 million, a fraction of the broader $2 billion limit under the policy's general coverage provision.

Froedtert sees things differently. In its view, the contamination exclusion is not enforceable because the policy effectively is at odds with itself (or, at the very least, ambiguous) in a way that must be read in favor of coverage. The tension Froedtert sees is between the additional coverage for communicable disease response, which covers virus-related losses, and the broad contamination exclusion, which expressly bars coverage for those same losses. If the contamination exclusion were enforceable, Froedtert urges, an insured could never recover for communicable disease response costs because any possible grant of coverage would be swept away by the contamination exclusion. Because courts must interpret policies to favor coverage over exclusions when the two

conflict, Froedtert views the contamination exclusion as unenforceable.

We cannot agree. What Froedtert sees as broad tension we see in much narrower terms—indeed, in terms that allow the provisions to operate within their respective domains within the policy and thus with independent effect.

Here is what we mean. The policy's general coverage is limited by accompanying exclusions, including the broad exclusion for contamination losses. In a later section, the policy then affords certain specified Additional Coverages, including for communicable disease response costs. That additional coverage is just that—additional coverage. It would not exist if it was not expressly delineated in the Additional Coverages section of the policy.

Perhaps it is easier to arrive at the same conclusion through the lens of the contamination exclusion. That exclusion is very broad and, by any measure, tells us that COVID-related losses fall outside the policy's general coverage. The only way Froedtert can locate coverage for COVID-related losses, then, is to find the coverage somewhere else in the policy. That somewhere else is within the separate Additional Coverages section, which, at least for purposes of the communicable disease response coverage, stands separate and apart from the policy's general coverage and related exclusions. We land on the same overarching takeaway: the Additional Coverages provisions operate with enough independence from the general coverage provision and its exclusions to preclude the Additional Coverages prefatory language from somehow relating back and redefining what constitutes physical loss or damage for purposes of the policy's general coverage and its broad contamination exclusion.

A more detailed point also warrants mention. Nested within the contamination exclusion to general coverage is more exclusionary language saying that the contamination exclusion does not apply to losses "directly resulting from other physical damage not excluded by this Policy." We read the phrase "other physical damage not excluded" as most naturally referring to the prefatory language of the Additional Coverages section, which defines the added coverages—including for communicable disease response—as "physical losses" for the purposes of that section. By its terms, then, the contamination exclusion does not apply to the additional grants of coverage expressly provided for later in the policy.

Certain language in the Additional Coverages provision for communicable disease response further helps to resolve the tension identified by Froedtert. The policy tells us that this added coverage is subject to "applicable exclusions." Froedtert sees the policy's general contamination exclusion as one such applicable exclusion, leading to the tension it identifies. We disagree. The most reasonable interpretation of the "applicable exclusions" language, one that "give[s] reasonable meaning to the entire policy," is that the contamination exclusion is not one that the parties believed to be "applicable" to the additional coverage, as any other conclusion would render the added coverage for communicable disease response an empty set. *1325 N. Van Buren, LLC v. T-3 Grp., Ltd.*, 716 N.W.2d 822, 840 (Wis. 2006). The better approach is to read the contamination exclusion's express exception for "physical damage not excluded by this Policy" as referencing, however obliquely, the additional coverage conferred by a provision like the one for communicable disease response. That construction harmonizes the policy in a way that makes the most sense of the broad contamination exclusion against

the additional coverage for communicable disease response costs.

Froedtert's remaining arguments are variations of this same idea—that certain language in the Additional Coverages section changes the clear and plain meaning of the general coverage provision and broad exclusion for viral contamination. But Froedtert's many proffered interpretations are not reasonable simply because they are possible. See *Wilson Mut. Ins. Co. v. Falk*, 857 N.W.2d 156, 164 (Wis. 2014). And Froedtert's interpretive disagreement with Factory Mutual, by itself, does not mean that the language is ambiguous. See *Sandy Point*, 20 F.4th at 331. Nor does the very existence of a difficult coverage question—like the one before us in this appeal—prove the presence of ambiguity. Sometimes a hard question is just hard.

In the end, Froedtert's fatal error is its reliance on the Additional Coverages provisions in isolation without reading the policy as a whole. When we read the policy page-by-page and section-by-section as we must and consider each grant of coverage and its applicable exclusions, we see that none of Froedtert's suggested interpretations are reasonable.

For these reasons, we AFFIRM.